METROPOLITAN PROPERTY
& CASUALTY INSURANCE
COMPANY, Appellant,

v.

Robert B. OVERSTREET, Judge, Scott
Circuit Court, Appellee,

and

Gary Afterkirk, Sylvia Banks; and Chris
Heard, d/b/a Lexington Motors (Real
Parties in Interest), Appellees.

No. 2002–SC–0032–MR.

Supreme Court of Kentucky.

April 24, 2003.

Catherine M. Stevens, John W. Walters, Lexington, for Appellant.

Robert Overstreet, Versailles, for Appellee Robert B. Overstreet, Judge, Scott Circuit Court.

Richard M. Rawdon, Jr., Georgetown, for Real Party in Interest Appellee Gary Afterkirk.

Jerry Anderson, Lexington, for Real Party in Interest Appellee Sylvia Banks.

R. Craig Reinhardt, Fowler, Measle & Bell, Lexington, for Real Party in Interest Appellee Chris Heard, d/b/a Lexington Motors.

Pamela Yvette Hourigan, Lexington, for Amicus Curiae Kentucky Academy of Trial Attorneys.

COOPER, Justice.

The underlying civil action was brought by Appellee Gary Afterkirk against Appellant Metropolitan Property & Casualty Insurance Company ("MetLife"[1]), After-

---

1. Although the caption to the petition for a writ of prohibition filed in the Court of Appeals identifies Appellant as Metropolitan Property & Casualty Insurance Company, the

kirk's uninsured motorists insurer, for personal injuries sustained in an automobile accident caused by the alleged negligence of an uninsured motorist. Pursuant to CR 35.01, MetLife moved for an order requiring Afterkirk to submit to a physical examination by Dr. Daniel D. Primm, Jr., an orthopedic surgeon. Alleging that Dr. Primm is biased against personal injury plaintiffs, Afterkirk objected and requested that a different doctor be appointed to conduct the examination. Alternatively, he moved for an order (1) permitting him to videotape the examination and/or permitting a physician or nurse of his choice to attend the examination, and (2) requiring Dr. Primm to provide information as to the number of CR 35.01 examinations performed by him during the past year, the number of patients seen for treatment purposes during the same period, and information concerning the income derived by Dr. Primm from his CR 35.01 examinations, reports, depositions and trial testimony. Appellee Judge Overstreet overruled Afterkirk's objection to Dr. Primm as the examiner pursuant to *Sexton v. Bates*, Ky.App., 41 S.W.3d 452 (2001) (which arose out of another CR 35.01 examination by Dr. Primm) but entered the following order:

1. The Plaintiff may videotape the medical examination by Dr. Primm of the Plaintiff. The videotape may be used by either party for impeachment purposes only.

2. The *Defendant* shall provide to Plaintiff's attorney at least ten (10) days prior to trial, the following information:

 a. The number of people the doctor saw for one time medical examina-

tions or evaluations upon behalf of employers, insurance companies, defendants in lawsuits or attorneys representing any of the above in the past twelve (12) months;

b. The number of patients seen by the doctor for treatment purposes in the past twelve (12) months;

c. The doctor's charge for each examination;

d. The doctor's charges for each deposition given as a result of having examined the person.

(Emphasis added.)

We assume that paragraphs 2c and 2d of the order pertain to CR 35.01 examinations and not examinations for purposes of treatment. MetLife filed a petition in the Court of Appeals for a writ to prohibit the enforcement of this order. CR 76.36(1); CR 81. The Court of Appeals denied the petition on the merits and MetLife now appeals to this Court as a matter of right. Ky. Const. § 115; CR 76.36(7)(a).

Since the Court of Appeals exercised its discretion to address the petition on its merits, *Southeastern United Medigroup v. Hughes*, Ky., 952 S.W.2d 195, 199 (1997), and Afterkirk does not even assert that MetLife has an adequate remedy by appeal, *see Wal–Mart Stores. Inc. v. Dickinson*, Ky., 29 S.W.3d 796, 800 (2000) (" 'once the information is furnished it cannot be recalled' ") (*quoting Bender v. Eaton*, Ky., 343 S.W.2d 799, 802 (1961)), we, too, will proceed directly to the merits of the appeal. For the reasons set forth *infra*, we affirm the Court of Appeals with respect to that portion of the trial court's order that permits the CR 35.01 examination to be videotaped and reverse with respect to

body of the document continually refers to Appellant as "MetLife Auto & Home Insurance Company." The text of Appellant's brief to this Court also identifies Appellant as "Met-

Life Auto & Home Insurance Company ('MetLife')." Thus, we adopt Appellant's reference to itself as "MetLife."

that portion of the order that requires MetLife to furnish documents and information solely within the possession, custody and control of Dr. Primm.

## II. CR 35.01 EXAMINATION.

■ Civil Rule 35.01 provides as follows: When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician, dentist or appropriate health care expert, or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

The rule was born out of controversy. Prior to the adoption of the Federal Rules of Civil Procedure ("FRCP"), the common law viewed court-ordered medical examinations as repugnant to a person's privacy and bodily integrity. Indeed, in *Union Pacific Ry. Co v. Botsford,* 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), the Court held that "[t]he inviolability of the person is as much invaded by a compulsory stripping and exposure [by the examining doctor], as by a blow." *Id.* at 251–52, 11 S.Ct. at 1001.

■ The drafters of CR 35.01's federal counterpart, FRCP 35(a), attempted to console the holders of this viewpoint by making the rule different from nearly every other federal rule. Whereas the basic rule of discovery is that "[p]arties may

obtain discovery regarding any matter, not privileged, which is relevant," *see* FRCP 26(b)(1) and CR 26.02(1), FRCP 35 is more restrictive. Before discovery is permitted under Rule 35, the movant must prove that the condition of the examinee is "in controversy" and demonstrate "good cause" for the examination. *See Schlagenhauf v. Holder,* 379 U.S. 104, 117–18, 85 S.Ct. 234, 242, 13 L.Ed.2d 152 (1964) (noting this distinction between FRCP 35(a) and other federal rules); *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.,* 297 F.2d 921, 924 (4th Cir.1962) ("there must be greater showing of need under Rules 34 and 35 than under the other discovery rules.").

However, this restriction did not mollify all of the rule's critics. In the seminal case of *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941),[2] FRCP 35 was attacked as invalid under the Rules Enabling Act, 28 U.S.C. § 723 (1934) (now 28 U.S.C. § 2072), in part because it allegedly violated "the important right to freedom from invasion of the person." *Id.* at 14, 61 S.Ct. at 426. While the Court upheld the rule, Justice Frankurter registered a vehement dissent joined by Justices Black, Douglas, and Murphy: "I deem a requirement as to the invasion of the person to stand on a very different footing from questions pertaining to the discovery of documents, pretrial procedure and other devices for the expeditious, economic and fair conduct of litigation." *Id.* at 18, 61 S.Ct. at 428.

■ Despite this storied past, Kentucky law since the enactment of the Kentucky Rules of Civil Procedure (CR), 1952 Ky. Acts, ch. 18, eff. July 1, 1953, has heretofore been silent on the question of what "conditions" may be imposed upon a CR 35.01 examination for the protection of the examinee once it has been determined that

**2.** *Sibbach* is famous, of course, for holding that rules regulating "procedure" are valid

under the Rules Enabling Act. 312 U.S. at 14, 61 S.Ct. at 426.

an examination is warranted. In *Turner v. Commonwealth,* Ky., 767 S.W.2d 557 (1988), and *Bart v. Commonwealth,* Ky., 951 S.W.2d 576 (1997), we clarified that CR 35.01 applies only to a "party" or one under the control or custody of a party. 767 S.W.2d at 559, 951 S.W.2d at 578; *but cf. Mack v. Commonwealth,* Ky., 860 S.W.2d 275, 277 (1993) (noting that due process may nevertheless require an examination of a nonparty prosecuting witness). In *Perry v. Commonwealth ex. rel Kessinger,* Ky., 652 S.W.2d 655 (1983), we held that the rule applies to a defendant in a paternity proceeding. *Id.* at 660. And, in *Taylor v. Morris,* Ky., 62 S.W.3d 377 (2001), we held that the plaintiff's claim that she had injured her neck and back, accompanied by the expected testimony of the plaintiff's doctor that she had a permanent impairment, was sufficient for the trial judge to find "good cause" to compel her to submit to a CR 35.01 examination. *Id.* at 380.

> A plaintiff in a negligence action who asserts mental or physical injury places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury.

*Id.* (*quoting Schlagenhauf v. Holder, supra,* at 119, 85 S.Ct. at 243) (internal citation omitted). However, these decisions only addressed when the rule authorizes a trial court to compel an examination, not what conditions the trial court may place on the examination itself.[3]

 Because FRCP 35(a) mirrors CR 35.01, "federal court decisions interpreting [FRCP 35(a)] may be accepted as persuasive authority when examining CR 35.01."

*Taylor, supra,* at 379. However, federal decisions are of only limited assistance with respect to the propriety of ordering the examination videotaped. To date, no published federal court of appeals opinion has reviewed a federal district court's decision to order, or refuse to order, the videotaping of a Rule 35(a) examination. Indeed, only one published federal court of appeals opinion has reviewed any district court decision with respect to Rule 35(a) "conditions"—and that was a review of a decision denying the imposition of conditions. *See Sanden v. Mayo Clinic,* 495 F.2d 221, 225 (8th Cir.1974) ("[a]lthough the examined party will usually be permitted to have his or her own physician present," the trial court did not abuse its discretion by denying the plaintiff, who was a registered nurse, that opportunity).

Federal trial courts have produced mixed results when deciding whether particular circumstances warrant the presence of a video camera or other recording device in the examination room. *See* 8A Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus *Federal Practice & Procedure: § 2236,* at 496 (2d ed.1994) (noting that federal courts have responded to issues of a third party or recording presence at Rule 35 examinations in "diverse ways that may, in large measure, be explained by the particular circumstances presented."); *compare, e.g., Zabkowicz v. West Bend Co.,* 585 F.Supp. 635, 636 (E.D.Wis.1984) (allowing examination to be videotaped), *with Abdulwali v. Washington Metro. Area Transit Auth.,* 193 F.R.D. 10, 14 (D.D.C.2000) (denying request to videotape).

Nevertheless, we are not left completely without direction. Courts have unani-

---

**3.** Note that in *Sexton v. Bates, supra,* the Court of Appeals addressed the issue of when an examinee may object to the opposing party's choice of examiner. However, *Sexton* dealt with "the person or persons by whom [the examination] is made," rather than the "conditions" of the examination.

mously accepted the tenet that the conditions of a Rule 35 examination are left to the sound discretion of the trial court. Wright, Miller, & Marcus, *Federal Practice & Procedure:* § *2234, supra,* at 476 ("The trial court has extensive discretion in determining the details of the examination."); *Sanden, supra,* at 225; *Lewin v. Jackson,* 108 Ariz. 27, 492 P.2d 406, 411 (1972); *Hayes v. District Court,* 854 P.2d 1240, 1245–46 (Colo.1993); *Jacob v. Chaplin,* 639 N.E.2d 1010, 1012 (Ind.1994); *Guskjolen v. Guskjolen,* 391 N.W.2d 639, 641 (N.D.1986); *State ex rel. Hess v. Henry,* 183 W.Va. 28, 393 S.E.2d 666, 669 (1990); *cf. Mack v. Commonwealth, supra,* at 277 (applying abuse of discretion standard to trial court's decision whether examinee is a "party" under CR 35.01). We have held in numerous cases that the trial court enjoys broad discretion in matters pertaining to discovery. *E.g., Berry v. Commonwealth,* Ky., 782 S.W.2d 625, 627–28 (1990); *see also Crawford–El v. Britton,* 523 U.S. 574, 598–99, 118 S.Ct. 1584, 1597, 140 L.Ed.2d 759 (1998) (noting trial court's "broad discretion" to tailor and limit discovery). Consequently, we conclude that the same standard should apply to a trial court's decisions with respect to a CR 35.01 examination and will review such decisions for abuse of discretion. *Cf. Miller v. United States Fid. & Guar, Co.,* Ky.App., 909 S.W.2d 339, 342 (1995) (applying "abuse of discretion" standard to trial court's decision as to whether insurer had shown "good cause" for a physical examination under KRS 304.39–270).

Other jurisdictions agree that *some* circumstances would merit an external presence in the examination room. As noted *supra,* those federal courts that have refused to allow such a presence have been federal district courts, and they have done so on the particular facts of the cases before them. *E.g., Abdulwali, supra,* at 14 (denying request to videotape when plaintiff offered only "unsupported assertion" that psychiatric examination was a manipulative attempt at deposing the plaintiff); *Holland v. United States,* 182 F.R.D. 493, 496 (D.S.C.1998) (denying request where no "compelling circumstances"); *Romano v. II Morrow, Inc.,* 173 F.R.D. 271, 274 (D.Or.1997) (denying request when "the plaintiffs have not provided an explanation for why they would require comfort during the examinations.").

Other federal district courts have allowed an audio recorder, stenographer, or video camera in the examination room. *Sidari v. Orleans Cty.,* 174 F.R.D. 275, 291 (W.D.N.Y.1996) (audio recorder); *Di Bari v. Incaica Cia Armadora, S.A.,* 126 F.R.D. 12, 14 (E.D.N.Y.1989) (stenographer); *Zabkowicz, supra,* at 636 (video camera). Still other federal district courts have allowed the examinee's attorney to attend the examination (a request Afterkirk did not make in the underlying action here). *Gensbauer v. May Dep't Stores Co.,* 184 F.R.D. 552, 553 (E.D.Pa.1999); *Vreeland v. Ethan Allen, Inc.,* 151 F.R.D. 551, 551 (S.D.N.Y.1993). And, some federal district courts have permitted the examinee's physician to attend in lieu of his attorney. *Lowe v. Philadelphia Newspapers, Inc.,* 101 F.R.D. 296, 299 (E.D.Pa.1983); *Warrick v. Brode,* 46 F.R.D. 427, 428 (D.Del. 1969); *Dziwanoski v. Ocean Carriers Corp.,* 26 F.R.D. 595, 598 (D.Md.1960).

In some states, the right to an external presence in the examination room is provided within the rule. Ariz. R. Civ. P. 35(a) (providing for right to audiotape and for examinee's "representative" to attend physical examination, and for videotaping upon showing of "good cause"); Cal.Code Civ. Proc. § 2032(g)(1) (giving attorney right to attend and record, but not participate in or disrupt, the examination); Ill. Stat. ch. 735, § 5/2—1003(d) (providing right of attendance by attorney or "other

such person as the plaintiff may wish."); Mich. Ct. R. 2.311 (providing that order "may" provide for attendance of examinee's attorney); Okla. Stat. tit. 12, § 3235(d) (giving examinee's "representative" right to attend); Pa. R. Civ. P. 4010(4)(i) ("The person to be examined shall have the right to have counsel or other representative present during the examination.").

Even absent a specific provision in the rule, many state courts have allowed a recording device or other external presence as a matter of course. *Langfeldt–Haaland v. Saupe Enters., Inc.*, 768 P.2d 1144, 1147 (Alaska 1989) ("We align Alaska with those authorities which allow plaintiff's counsel to attend and record, as a matter of course, court-ordered medical examinations in civil cases."); *U.S. Sec. Ins. Co. v. Cimino*, 754 So.2d 697, 700–01 (Fla.2000) ("Florida follows a liberal view when determining whether attorneys may attend examinations."); *Jacob v. Chaplin*, 639 N.E.2d 1010, 1013 (Ind.1994) (allowing either party to record "in the absence of some overriding reason to prohibit that recording."); *B.D. v. Carley*, 307 N.J.Super. 259, 704 A.2d 979, 981 (App.Div.1998) ("Plaintiff's right to preserve evidence of the nature of the examination, the accuracy of the examiner's notes or recollections, the tones of voice and the like outweigh the examiner's preference that there be no recording device."); *Parsons v. Hytech Tool & Die, Inc.*, 241 A.D.2d 936, 661 N.Y.S.2d 362 (N.Y.App.Div.1997) ("A plaintiff being examined by a defense physician is entitled to have his or her attorney present during the examination unless defendant makes a positive showing of necessity for the exclusion of the attorney."); *Tietjen v. Dep't of Labor and Indus.*, 13 Wash.App. 86, 534 P.2d 151, 154 (1975) (holding that attorney is entitled to be present and "[a]ny unnecessary interfer-

ence caused by an attorney could be alleviated by specific court order.").

Thus, it cannot be seriously argued that under no circumstances should an external presence be allowed in the examination room. The debate lies in what circumstances and in what form an external presence may be appropriate. As the discussion *supra* indicates, federal district courts have been less likely to allow such a presence than state courts. Commentators have attributed this trend to a difference in how the examination is perceived. *See* William S. Wyatt & Richard A. Bales, *The Presence of Third Parties at Rule 35 Examinations*, 71 Temp. L.Rev. 103, 116–24 (1998); Wright, Miller, & Marcus, *Federal Practice & Procedure: § 2236, supra*, at 496–97. Is the Rule 35 examination a purely objective and scientific procedure? Or is the examination a fundamental part of the adversary process?

Federal courts generally have adopted the philosophy that such an examination should be objective and scientific. Accordingly, they have been wary of any external presence that has the potential to insert the adversary process into the examination room. *E.g., Romano, supra*, at 274 (" 'the presence of the observer interjects an adversarial, partisan atmosphere into what should be otherwise a wholly objective inquiry.' "), *quoting Shirsat v. Mut. Pharm. Co.*, 169 F.R.D. 68, 71 (E.D.Pa.1996); *Tomlin v. Holecek*, 150 F.R.D. 628, 633–34 (D.Minn.1993) ("Were we to honor the Plaintiff's request, that his counsel be present during the interview or that a taperecording of the interview be preserved so as to assist in his attorney's questioning of Dr. Aletky, we would be endorsing, if not promoting, the infusion of the adversary process into the psychologist's examining room ...."); *but see Gensbauer, supra*, 184 F.R.D. at 553 ("Although, in theory, an [independent medical

examination] is to be scientific rather than adversarial, experience suggests that it is often the latter."); *Di Bari, supra,* 126 F.R.D. at 14 ("a psychiatric examination by defendant's doctor is in reality adversarial in nature.").

States have generally recognized that while a Rule 35 examination is ideally a purely scientific exercise, it is also, inevitably, another arena in which the litigation is joined. *E.g., Jacob, supra,* 639 N.E.2d at 1013 ("The purpose of the examination is to further the litigation process."); *Jakubowski v. Lengen,* 86 A.D.2d 398, 400–01, 450 N.Y.S.2d 612 (N.Y.App.Div.1982) ("A physician selected by defendant to examine plaintiff is not necessarily a disinterested, impartial medical expert, indifferent to the conflicting interests of the parties."). The examining doctor may be encouraged by his employer to treat the examination as a *de facto* deposition. Wright, Miller, & Marcus, *Federal Practice & Procedure: § 2236, supra,* at 496. Given this reality, these states hold by rule or decision that the examinee may be entitled to a degree of protection against a physician hired by the adversary.

We are persuaded by the latter view. By its very terms, CR 35.01 applies only when the mental or physical condition of the examinee is "in controversy." The examining party, almost by definition, moves for a CR 35.01 examination with the hope of furthering its litigation position.[4] Thus, the examining physician will nearly always be hired with an adversarial mindset. In *Tuttle v. Perry,* Ky., 82 S.W.3d 920 (2002), we recognized that "expert witnesses are often compensated handsomely

and it is widely believed that they may be expected to express opinions that favor the party who engaged them and who pays their fees." *Id.* at 923. *Tuttle* also noted that "certain expert witnesses derive a significant portion of their total income from testifying in litigation." *Id.* "We would close our eyes to reality," *Hill v. Colorado,* 530 U.S. 703, 767, 120 S.Ct. 2480, 2517, 147 L.Ed.2d 597 (2000) (Kennedy, J., dissenting), were we to pretend, simply because CR 35.01 examinations should be conducted with only the health of the examinee in mind, that they always are so conducted.[5]

■ Nevertheless, recognition of this potentiality does not mean that an external presence should automatically be permitted, as it is in some jurisdictions discussed *supra.* Indeed, the purpose of CR 35.01 is to "level the playing field." *Taylor v. Morris, supra,* at 379; *Sexton v. Bates, supra,* at 457. An external presence that deprives the examining party of the opportunity to level the playing field by conducting a truly objective examination would destroy the very purpose of the rule.

■ Therefore, we hold that the trial court may impose an external presence at a CR 35.01 examination only upon a showing of "good cause" by the examinee. This holding places Kentucky in the median of the authorities discussed *supra.* We reject the "compelling need" test invented by some federal district courts, finding that test to be unsupported by the language or rationale of CR 35.01. Similarly, we decline to make an external presence automatic. Unlike jurisdictions such as California and Pennsylvania, our rule contains

---

4. Of course, a CR 35.01 examination may also convince the examining party that the "mental and physical condition" of the examinee is no longer "in controversy" and thereby lead to settlement.

5. This is not to say that CR 35.01 examinations are necessarily biased. No doubt, most doctors approach such examinations with a cold and scientific eye that gives no thought to financial remuneration. We merely recognize that each such examination is at least potentially colored by the adversarial process.

no provision for the automatic attendance of the examinee's attorney, physician, or recording device.

This approach also most closely conforms to the plain language of CR 35.01 and the ordinary operation of the Kentucky Rules of Civil Procedure. As noted *supra*, CR 35.01, like FRCP 35(a), is procedurally unusual in that it permits the examination only upon a showing of "good cause" by the examining party. This requires "an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf, supra*, at 118, 85 S.Ct. at 242–43. The rule imposes no such requirement upon the examining party with regard to the "conditions" of the examination. It simply requires that the trial court's order *"shall specify* the time, place, manner, *conditions*, and scope of the examination and the person or persons by whom it is to be made." (Emphasis added.)

Ordinarily, a party seeking to limit discovery is required to move for a protective order pursuant to CR 26.03. *See Sexton v. Bates, supra*, at 457 (noting propriety of application of protective order to CR 35.01); *see also Volvo Car Corp. v. Hopkins*, Ky., 860 S.W.2d 777, 779 (1993); *Shobe v. EPI Corp.*, Ky., 815 S.W.2d 395, 398 (1991). Parties may limit discovery pursuant to CR 26.03 only "for good cause shown." Given the frequency of its usage, this standard is well known to both trial courts and attorneys. Thus, we find that "good cause" is the appropriate standard by which to evaluate conditions sought by the examinee on a CR 35.01 examination. *See* Wright, Miller, & Marcus, *Federal Practice & Procedure: § 2234, supra*, at 475–76 ("The provisions of Rule 26(c) on protective orders are applicable to Rule 35

and a court ordering a physical or mental examination may make appropriate protective provisions in its order.").

██ The trial court should examine each request individually, and decide in its discretion whether the proposed external presence in the examination room is supported by "good cause." In exercising this discretion, the trial court should weigh three primary factors. First, it should consider the nature of the proposed external presence. An attorney is most likely to be problematic because of the potential to unfairly disrupt the examination. As some commentators have noted, "[e]ven a few well-timed objections could seriously undermine the examination, and it is not difficult to imagine an overzealous attorney making more than a few objections." Wyatt & Bales, *supra*, at 117. A court order requiring the attorney to remain silent lessens the potential for disturbance but the attorney's presence is then of doubtful utility to the examinee because an attorney may not act as a witness. SCR 3.130(3.7); *Morrison's Adm'r v. Redmon*, Ky., 287 S.W.2d 167, 168 (1956) ("when a lawyer is a witness for his client ... he should leave the trial of the case to other counsel"). Thus, an attorney could not dispute a perceived inaccuracy in the doctor's testimony without jeopardizing his representation of the examinee. In fact, Afterkirk's attorney advised during oral argument that this was precisely why he did not ask that he be permitted to attend the examination. While we do not hold that an attorney should never be allowed to attend a CR 35.01 examination of his client, it is difficult to conceive of circumstances where such attendance would be warranted.

On the other hand, the potential disturbance from a video or audio recorder is minimal, assuming the operator remains stationary, a suitable distance from the

examination table, and does not otherwise interfere with the conduct of the examination. *See Jacob, supra,* 639 N.E.2d at 1013 ("We also fail to see any reason why electronic recording of the examination would in and of itself impede an examiner's ability to conduct a fair and complete examination."); *Henry,* 393 S.E.2d at 669 ("an unobtrusive device, such as a tape recorder, presents little risk of interference in the physician's examination."). A video camera also has the advantage of creating an exact record of the examination. Even if so inclined, no examiner would physically abuse an examinee in front of a camera. Further, there will be no battle of words at trial. If the examiner remembers the details of the examination differently from the examinee, the videotape will be available to put the matter to rest. *See Gibson v. Gibson,* 456 So.2d 1320, 1321 (Fla.Dist.Ct.App.1984) ("it is the privacy of the [examinee] that is involved, not that of the examiner, and if the [examinee] wants to be certain that this compelled, although admittedly reasonable, intrusion into her privacy be accurately preserved, then she should be so entitled.").

The presence of a physician or nurse will usually fall somewhere in the middle of this spectrum. When the examiner is aware that a colleague is observing the examination, he or she may be more likely to conform to the highest technical and ethical medical standards. *See* Wyatt & Bales, *supra,* at 127 ("The presence of a physician may have a minimally adverse effect on the examination, but the presence also has a high probability of facilitating a fair and impartial search for the relevant information."). Medical observers are less likely than attorneys to act as adversaries yet may ensure that the examination is fairly and properly conducted. *See* Wright, Miller & Marcus, *Federal Practice & Procedure: § 2236, supra,* at

497 (noting that a scientifically valid test may be conducted in a faulty manner). As noted *supra,* several courts have allowed a physician to be present when the examinee's attorney has been excluded from the examination. *Lowe v. Philadelphia Newspapers, Inc.,* 101 F.R.D. 296, 299 (E.D.Pa.1983); *Warrick v. Brode,* 46 F.R.D. 427, 428 (D.Del.1969); *Dziwanoski v. Ocean Carriers Corp.,* 26 F.R.D. 595, 598 (D.Md.1960). Except in unusual circumstances, the trial court should order that such persons, if allowed, be only silent observers. The concern for a level playing field mandates that the CR 35.01 examiner be permitted to work in peace. Generally speaking, interruption will be unnecessary because evidence obtained through improper questioning by the examiner may be excluded at trial. *Wheat v. Biesecker,* 125 F.R.D. 479, 480 (N.D.Ind.1989).

Second, the trial court should consider evidence that the requested examination might by conducted in an unfair manner. This evidence may include, but should not be limited to: (a) evidence of past physical abuse of examinees by the examiner; (b) evidence of past misrepresentations by the examiner; (c) evidence that the examiner has financial incentives to consider the examinee as an adversary; and (d) evidence that the examiner's testimony is almost always slanted against the examinee, *e.g.,* by showing that the doctor has seldom if ever found an examinee to be disabled.

The mere fact that the doctor is being compensated should carry little weight since virtually all CR 35.01 examiners are compensated. However, the trial court should consider an allegation, *e.g.,* that the examiner will be paid a bonus if the jury returns a verdict against the examinee, or that a substantial portion of the examiner's income is derived from repeat CR 35.01 business. *Cf.* Wyatt & Bales, *supra,* at

125–26 (listing examples of potential financial bias).

Third, the trial court should consider the nature of the examination itself. For example, some courts have recognized that psychiatric examinations in particular "necessitate an unimpeded, one-on-one exchange between the doctor and patient." *Tomlin v. Holecek*, 150 F.R.D. 628, 631–32 (D.Minn.1993); *see also Abdulwali, supra*, 193 F.R.D. at 13. An examining party resisting an external presence may submit an affidavit or other evidence detailing the precise reasons why the examination should proceed in isolation. Obviously, an affidavit supported by medical evidence and/or scientific analysis of the negative effects of an external presence during a particular examination will carry greater weight with the trial court than the physician's mere stated preference to work unobserved.

Given the analysis and factors discussed *supra*, we conclude that Judge Overstreet had "good cause" to order that Dr. Primm's examination of Afterkirk be videotaped,[6] thus, did not abuse his discretion in that respect. Pursuant to CR 76.36(5), Afterkirk submitted evidence to the Court of Appeals in support of the order that tended to indicate Dr. Primm's bias. Although this evidence was not formally placed before Judge Overstreet, Appellees note that Judge Overstreet was the trial judge in one of the trials from which the information was gathered, *i.e., Votaw v. Anchor Foods*, No 98–Cl–000489 (Scott Cir. Ct.2001), and called the judge's attention to the *Votaw* case during oral argument on the proposed CR 35.01 conditions.

In the *Votaw* case, Dr. Primm testified by deposition that in the year 2001 his CR 35.01 examinations amounted to approximately ten to fifteen percent of his practice. Dr. Primm estimated that he saw between thirty-five and seventy patients per week. Therefore, it may be estimated that he conducted between 3.5 (10% of 35) and 10.5 (15% of 70) CR 35.01 examinations per week. In general, he charged between $410.00 and $625.00 for each such examination, including the cost of x-rays. He was required to give a deposition in about one-third of such cases, and Appellees estimated that his charge for each deposition ranged from $650.00 to $900.00.[7] Dr. Primm testified that he was "slowing down" in 2001 and working only forty to forty-two weeks per year. Thus, based on forty weeks of work in 2001, it could be estimated for purposes of the petition that Dr. Primm earned annually between $83,400.00 (assuming 3.5 examinations per week at $410.00 and one deposition at $650.00) and $370,500.00 (assuming 10.5 examinations per week at $625.00 and three depositions at $900.00) for his CR 35.01 work.

Dr. Primm also noted in his *Votaw* deposition that he had been performing these examinations for some time. He conceded that during a 1993 deposition he testified that he worked fifty weeks per year and CR 35.01 examinations constituted as

---

6. We do not address whether the trial court would be within its discretion to allow the videotape to be used for purposes other than impeachment. That is an evidentiary issue not raised in the petition. However, it was suggested during oral argument that the videotape might serve as a useful visual aid during the examiner's direct testimony, much as does an x-ray film or a mock human skeleton.

7. Unlike the other figures listed *supra*, Dr. Primm's deposition fee in 2001 is not indicated by the excerpt in the record from his deposition in the *Votaw* trial. Nevertheless, since the figure is not disputed by MetLife, we use it for the sake of illustration. We do not rely on any particular numbers here but only note evidence that Dr. Primm earned substantial income from his CR 35.01 work in 2001.

much as twenty-five percent of his practice. Thus, Dr. Primm earned as much as $832,500.00 annually from such examinations at that time (50 weeks × (18 exams at $625.00) + (6 depositions at $900.00)).[8] Judge Overstreet was familiar with these figures from having presided over the *Votaw* trial.

Appellees also submitted to the Court of Appeals affidavits from the *Votaw* examinee and another examinee from a different case, Rose Rhodus, regarding their experiences with Dr. Primm. Betty Votaw averred in her affidavit that Dr. Primm was "very rude and repeatedly distorted what I told him. He tried to get me to say things that I had not stated. He was very intimidating." She claimed that although she has walked with a distinct limp since childhood, Dr. Primm stated in his notes that she did not walk with a limp. Further, when she told Dr. Primm she had problems raising her arm, "he grabbed [her] arms and jerked them up hurting [her]."

Rhodus similarly averred that Dr. Primm "was extremely rude to me and tried to mislead me regarding my description of my symptoms." She claimed that Dr. Primm "never asked me about any of the pain I was experiencing," and when she brought the subject up, "he abruptly turned away from [her] and walked out of the room concluding the examination." Rhodus also described Dr. Primm as physically abusive. When she explained that she was unable to touch her toes, Dr. Primm allegedly "placed his hands upon [her] and tried to physically force [her] to make the bending movement that he had requested." Of course, we take no view with respect to the accuracy of these alle-

gations but only note that they support Judge Overstreet's decision.

■ MetLife does not articulate any convincing way in which a video camera would impair Dr. Primm's examination. Its suggestion that Afterkirk would "perform" for the camera is speculative and unconvincing. Issues of credibility, including any false performance by Afterkirk, are for the jury to evaluate. *Norris v. Commonwealth*, Ky., 89 S.W.3d 411, 417 (2002); *Young v. Commonwealth*, Ky., 50 S.W.3d 148, 165 (2001); *Commonwealth v. Smith*, Ky., 5 S.W.3d 126, 129 (1999). And, while Dr. Primm purportedly prefers to work unobserved, MetLife provided no persuasive reason why that preference is medically necessary.

Our analysis of CR 35.01 applies equally to examinations conducted by plaintiffs and defendants. Although MetLife correctly observes that in most circumstances it is a defendant's physician who will conduct an examination of a plaintiff, that is not always the case. *Schlagenhauf, supra*, at 112–14, 85 S.Ct. at 239–40 (noting that Rule 35 applies equally to defendants and plaintiffs); *Harabedian v. Superior Court*, 195 Cal.App.2d 26, 31–32, 15 Cal.Rptr. 420 (Cal.Ct.App.1961) (ordering defendant to undergo eye examination); *Brewster v. Martin Marietta Aluminum Sales, Inc.*, 107 Mich.App. 639, 309 N.W.2d 687, 691 (1981) (reversing order denying mental examination of sexual harassment defendant); *Constantine v. Diello*, 24 A.D.2d 821, 821–22, 264 N.Y.S.2d 153 (N.Y.App. Div.1965) (ordering defendant to undergo eye examination). Moreover, even when the defendant's physician is conducting the examination for the purpose of evaluating the plaintiff's claimed injuries, a video record of that examination has the potential

---

**8.** Of course, this estimate would need to be decreased for any difference in fees between 1991–1992 and 2001.

to be extremely helpful. The videotape may be used both to bolster the examining doctor's testimony and to impeach the plaintiff and the plaintiff's medical expert. Any video or audio record of the examination should be made available to both parties pursuant to CR 35.02.

Finally, we reject Appellant's suggestion that it is "unfair" to allow Dr. Primm's examination to be recorded when Afterkirk had the opportunity to meet with his own doctor unobserved. While this viewpoint admittedly has been advanced by some federal trial courts, *e.g., Tomlin, supra*, at 633, *Hertenstein v. Kimberly Home Health Care, Inc.*, 189 F.R.D. 620, 631 (D.Kan.1999), we find it unpersuasive here. First, we have allowed Dr. Primm's examination to be videotaped only after a showing of "good cause." The district courts in *Tomlin* and *Hertenstein* recognized their own authority to record the examination upon a showing of "good cause," 150 F.R.D. at 633 n. 4, 189 F.R.D. at 628, but decided that "good cause" had not been shown, largely because the examinations in those cases were *psychiatric* examinations that those courts believed required an "unimpeded, one-on-one exchange between the doctor and patient." 150 F.R.D. at 633, 189 F.R.D. at 630–31. This case presents only the issue of a physical examination.

Second, there is an important difference between a party's examination by his own doctor and a court-ordered examination by a doctor hired by that party's adversary. The former is voluntary, usually (though admittedly not always) non-adversarial, and unlikely to produce differing accounts of what occurred during the examination. The latter, as discussed *supra*, is compelled by the court, inherently adversarial, and likely to produce accusations of misrepresentation like those made by Betty

Votaw and Rose Rhodus. Indeed, the United States Supreme Court once referred to the compelled examination, not inaccurately, as "a compulsory stripping and exposure." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 252, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891).

Third, a trial court simply has no power to order conditions for a party's examination by that party's own doctor. The trial court's power to do so with respect to Dr. Primm's examination is authorized by CR 35.01, the same rule that provides the only authorization for the involuntary examination, itself. There will be equal access to the only videotape produced in this case pursuant to CR 35.02 and, under Judge Overstreet's order, both parties may make use of the videotape equally for impeachment purposes. The order thus gives rise to no cognizable "unfairness."

## II. FINANCIAL DISCOVERY.

 In support of its argument that the trial court should not have ordered the discovery of Dr. Primm's financial records, MetLife relies almost entirely on the comment of our predecessor court in *Current v. Columbia Gas of Kentucky*, Ky., 383 S.W.2d 139 (1964), that while evidence of the expert witness's compensation is admissible at trial, "the better rule is to limit the showing to the fact that payment is being made. To permit details of the compensation injects collateral matter into the trial." *Id.* at 144. However, we overruled that passage in our recent decision in *Tuttle v. Perry*, Ky., 82 S.W.3d 920 (2002).[9] *Tuttle* held that an expert witness may be questioned as to the amount of his or her compensation because "it is widely believed that [expert witnesses] may be expected to express opinions that favor the party who engaged them and who pays

---

9. MetLife's brief was filed and oral arguments were conducted before *Tuttle* was rendered.

their fees." *Id.* at 923. Thus, we held that juries are entitled, before relying on an expert's opinion, to know how much that expert is being paid for the opinion. *Id.* at 924.

We now hold that an expert physician's annual Rule 35.01 income, and the percentage such examinations constitute of his general practice, is discoverable, subject, of course, to the relevant provisions of CR 26.03. *Tuttle* relied extensively on a decision by Maryland's highest court in *Wrobleski v. Nora de Lara*, 353 Md. 509, 727 A.2d 930 (1999), which addressed almost this very issue in the context of cross-examination. *Id.* at 517, 727 A.2d 930. As we noted in *Tuttle*, Wrobleski confronted the question of whether a Maryland trial court had erred by "allowing inquiry as to the amount of income earned by the expert witness and the approximate portion of the witness's total income derived from serving as an expert witness." 82 S.W.2d at 923. Finding that "it is generally appropriate for a party to inquire whether a witness offered as an expert in a particular field earns a significant portion or amount of income from applying that expertise in a forensic setting," *Wrobleski* held that the trial court did not abuse its discretion. *Id.* at 938.

■ It is undeniable that an expert's tendency to slant his testimony may be affected not just by how much he is being compensated on one particular occasion, but also by how much of his annual income is derived from similar testimony. *Tuttle, supra*, at 923 (agreeing that "certain expert witnesses derive a significant portion of their total income from testifying in litigation."); *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir.1980) ("[a] showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases."). A jury could reasonably believe that a physician who derives a substantial percentage of his annual income from CR 35.01 examinations, potentially earning hundreds of thousands of dollars every year from such examinations alone, might be tempted to slant his testimony to suit his employer.[10] As the Supreme Court of Illinois has noted,

> [T]he financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case. A favorable verdict may well help him establish a "track record" which, to a professional witness, can be all-important in determining not only the frequency with which he is asked to testify but also the price which he can demand for such testimony. . . . We thus find that it was proper to inquire how much Dr. Martins was earning annually from services relating to rendering expert testimony.

*Trower v. Jones*, 121 Ill.2d 211, 117 Ill.Dec. 136, 520 N.E.2d 297, 300 (1988). In contrast, a physician conducting his first and only CR 35.01 examination, but earning the same fee, might face a lesser temptation. Yet, the jury would be unable to distinguish that physician from the "professional witness" if we were to flatly prohibit the discovery ordered in this case. We hold that such evidence is generally discoverable and that the extent to which it may be used for impeachment purposes at trial is within the sound discretion of the trial judge exercised pursuant to KRE 403 and KRE 611.

---

10. Of course, we agree with Maryland's highest court that "the fact that an expert witness devotes a significant amount of time to forensic activities or earns a significant portion of income from those activities does not mean that the testimony given by the witness is not honest, accurate, and credible. It is simply a factor that is proper for the trier of fact to know about and consider." *Wrobleski, supra*, at 938.

Another issue here, however, is whether the evidence is discoverable by a court order directed to the *party* who employed the expert witness. We note at the outset that CR 26.01 permits discovery "by one or more of the following methods: depositions upon oral examination [CR 30] or written questions [CR 31]; written interrogatories [CR 33]; production of documents or things or permission to enter upon land or other property, for inspection and other purposes [CR 34]; physical and mental examinations [CR 35]; and requests for admission [CR 36]." If discovery is sought by deposition, CR 45.04 provides the additional tool of a subpoena duces tecum. A court order is generally appropriate only upon the failure of a party or witness to comply with a proper discovery request. CR 37.01(b)(i).

Afterkirk has never sought discovery through the methods described in CR 26.01. He simply requested an order requiring *Dr. Primm*, a nonparty, to produce his business and financial records or information contained therein pertaining to the number of CR 35.01 examinations performed by him and the income he derived therefrom. Such an order equates to a CR 37.01 order to comply with a CR 33 interrogatory or a CR 34 request for production of documents.

However, both CR 33.01 and CR 34.01 apply only to interrogatories and requests for production directed to a "party." It has long been the law that, while a nonparty witness can be required by subpoena duces tecum to produce in conjunction with the witness's deposition or trial testimony relevant and unprivileged documents in his or her possession, the witness cannot be ordered to produce those documents for purposes of discovery in advance of the testimony. *Marion Nat. Bank v. Abell's Adm'x*, 88 Ky. 428, 11 S.W. 300, 301 (1889). Adoption of the Kentucky Rules of Civil Procedure effected no change in that respect. *See* Kurt A. Philipps, Jr., 6 *Kentucky Practice, Rules of Civil Procedure Annotated*, CR 34.01, Comment 5, at 642 (5th ed. West 1995) ("Rule 34 relates only to parties to an action"). *See also Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 416 (9th Cir.1985) ("Rule 34 may not be used to discover matters from a nonparty."); *Fisher v. Marubeni Cotton Corp.*, 526 F.2d 1338, 1341 (8th Cir.1975) (production of documents from a nonparty can be compelled only by a subpoena duces tecum issued under CR 45.01's federal counterpart, FRCP 45(d)(1)); Wright, Miller & Marcus, 8A *Federal Practice & Procedure: § 2108, supra*, at 60.

■ The order as actually entered requires *MetLife* to produce *Dr. Primm's* business and financial records or information contained therein. However, CR 34.01, as enforced through CR 37.01, permits production and inspection only of documents and other records "which are in the possession, custody or control of the party upon whom the request is served." *See* Phillips, *supra*, CR 34.01, Comment 3, at 641 ("The only limitations upon the pursuit of this discovery method are that the materials or property be in the possession, custody or control of the party from whom discovery is sought and the discoverable matter must fall within the scope of Rule 26.02."). " 'Control' with respect to the production of documents is defined 'not only as possession but as the legal right to obtain the documents requested upon demand.' " *Cochran Consulting, Inc. v. Uwatec USA, Inc.*, 102 F.3d 1224, 1229–30 (Fed.Cir.1996) (*quoting Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir.1984)). The fact that MetLife employed Dr. Primm to examine Afterkirk does not give MetLife the legal right to obtain upon demand Dr. Primm's business and financial records or information contained therein. *Searock, supra*, at 653–54 (purchaser of sunken vessel counterclaiming

against seller for negligent design could not be compelled to produce documents in possession of persons and corporations hired by him to perform repair work on the vessel); *Lewis v. Cotton Belt Route— St. Louis S.W. Ry. Co.*, 217 Ill.App.3d 94, 159 Ill.Dec. 995, 576 N.E.2d 918, 928 (1991) (plaintiff could not be compelled to produce handwritten notes taken by nurse who accompanied plaintiff to Rule 35–equivalent examination because nurse was not an employee of plaintiff or counsel but an independent contractor).

This is not to say that MetLife cannot be compelled to produce, pursuant to CR 33 and CR 34, records and information in its possession, custody or control, *e.g.*, the number of examinations performed by Dr. Primm on its behalf and the amounts paid by it to Dr. Primm for examinations, reports, depositions and trial testimony; or that Dr. Primm cannot be compelled by subpoena duces tecum issued pursuant to CR 45.04 to produce at a properly noticed deposition or at trial the requested documents and information in his possession. We hold only that MetLife cannot be compelled to produce documents and information pertaining to Dr. Primm that are not in its "possession, custody or control."

Accordingly, we affirm the Court of Appeals with respect to that portion of the trial court's order that permits the CR 35.01 examination to be videotaped, reverse the Court of Appeals with respect to that portion of the order that requires MetLife to furnish documents and information solely within the possession, custody and control of Dr. Primm, and direct that the writ be issued with respect to that latter aspect of the trial court's order.

All concur.