**Tony N. TUTTLE, Administrator of the Estate of Christopher A. Tuttle, Deceased, et al. Appellants**

v.

**Frank A. PERRY, M.D. and Ronald A. Berry, M.D. Appellees**

No. 2001–SC–0215–DG.

Supreme Court of Kentucky.

Aug. 22, 2002.

Pamela Bratcher, Bratcher & Hixson, Bowling Green, David Randolph Smith, David Randolph Smith & Associates, Nashville, for Appellants.

E. Frederick Straub, Jr., Guthrie H. Allen, III, Whitlow, Roberts, Houston & Straub, PLLC, Paducah, for Appellees, Frank A. Perry, M.D.

Scott P. Whonsetler, Craig L. Johnson, Whonsetler & Associates, P.S.C., Louisville, for Appellees, Ronald A. Berry, M.D.

6. Ky., 455 S.W.2d 550 (1970).

LAMBERT, Chief Justice.

The use of highly compensated, learned professionals as expert witnesses in complex litigation has become axiomatic. Many cases become reduced to a "battle of experts" and parties who enter the fray understand from the outset that the qualifications and testimonial persuasiveness of their experts will be indicative of the outcome.[1] As such, desirable persons willing to serve as expert witnesses are able to command substantial fees, often in excess of their level of compensation as practitioners of their professions. Some even devote more time and effort to their expert witness sidelines than to their underlying professional practices. With this evolution of litigation practice, and recognizing that this Court has not directly considered whether an expert witness may be questioned as to amount of compensation since 1964, nor since the 1990 adoption of the Kentucky Rules of Evidence, we granted discretionary review of the Court of Appeals' opinion denying the right to so inquire.

On April 29, 1997, Christopher Tuttle, a man twenty-three years of age, went to the emergency room at Greenview Hospital complaining of chest pain. He was treated by Dr. Frank Perry who, after having an EKG and chest x-ray performed, diagnosed gastritis and prescribed a Gl cocktail. Tuttle was discharged with medication and instructed to see his family physician.

On May 3, 1997, Tuttle went to an urgent care facility again complaining of chest and abdominal pain, and on this occasion, he was treated by Dr. Ronald Berry. Dr. Berry was informed of Tuttle's recent Greenview Hospital tests and did not repeat those tests. Based on the previous test results and his examination, Dr. Berry diagnosed gastritis and scheduled Tuttle for a gallbladder ultrasound and upper Gl tests to be performed on May 6.

Tuttle did not keep the May 6 appointment, but was called by someone at UrgentCare and requested to come in for a follow-up visit. He went to UrgentCare on May 7 where he was seen by Dr. Richard Larson. Tuttle complained of chest pain and shortness of breath and Dr. Larson ordered an EKG and chest x-ray. After the chest x-ray, while walking back to the examination room, Tuttle collapsed and died shortly thereafter of a ruptured thoracic aortic aneurism.

Litigation was brought by the decedent's estate. In discovery, it was revealed that one of Dr. Perry's expert witnesses testifies 85–90% of the time for the defense in medical negligence cases; that he reviews twenty-five cases per year; and that his rate of compensation is $2,000 per day during trial and $500 for the first hour of deposition and $300 per hour thereafter. Dr. Perry's other expert testified in discovery that he charges $5,000 per day for trial, $400 per hour for deposition, and $250 per hour for case review. Despite these facts, the trial court ruled *in limine* that appellants, plaintiffs at trial, would be precluded from inquiry as to the amount of expert witness compensation. The case was tried to an 11–1 jury verdict for the defendants, appellees herein, and judgment in accordance with the jury verdict was duly entered. On appeal, the Court of Appeals considered the issues presented and, discerning no reversible error, affirmed the trial court. This Court granted discretionary review to consider three procedural issues, and to determine whether

---

1. Justin P. Murphy, *Expert Witnesses at Trial: Where are the Ethics?*, 14 GEO. J. LEGAL ETHICS 217 (Fall, 2000).

there was error, and if so, whether a new trial is required.

■ The only issue we will need to decide is whether the trial court erred in prohibiting appellant's cross-examination of appellees' expert witnesses as to the amount of their fees and compensation for testifying in the case. At the outset, we observe that "All relevant evidence is admissible" except as otherwise provided, and "evidence which is not relevant is not admissible."[2] " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[3] According to Professor Lawson, "[t]he law of evidence tilts heavily toward admission over exclusion, for there is an inclusionary thrust in the law that is powerful and unmistakable."[4] We have recently said as much in *Springer v. Commonwealth:* "Relevancy is established by any showing of probativeness, however slight."[5] *Springer* quoted *Turner v. Commonwealth* as follows:

> An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not. . . . It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent,

the proposition for which it is offered still can seem quite improbable.[6]

*Springer* also observed that relevant evidence includes not only facts tending to prove an element of the offense, but also facts tending to disprove a defense. As a primary responsibility of a jury is to determine the weight of evidence and the credibility of witnesses, KRE 104(e) declares that the rule does not limit the right of a party to introduce evidence relevant to weight or credibility "including evidence of bias, interest or prejudice."[7]

In only two recent cases has this Court come close to the issue presented here. The first case is *Current v. Columbia Gas of Kentucky*[8] which was an action against the gas company for injuries arising from carbon monoxide poisoning. Testifying for the gas company was Professor Warren A. Cook. His testimony generally favored the gas company, but the Court, on appeal, identified one portion of his testimony that it believed created a submissible issue. On the evidentiary issue before us, the Court in *Columbia Gas* held that in ordinary circumstances, proof of the amount of compensation injects a collateral matter into the trial and should be avoided. The Court did say, however, that

> It is generally recognized that inquiries of this type rest largely within the discretion of the trial court, and absent a showing of abuse of discretion, the limi-

2. KRE 402.

3. KRE 401.

4. ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.05, p. 53 (3d ed. Michie 1993).

5. Ky., 998 S.W.2d 439, 449 (1999).

6. *Turner v. Commonwealth*, Ky., 914 S.W.2d 343, 346 (1996) (quoting ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW

HANDBOOK § 2.05, p. 53 (3d ed. Michie 1993)).

7. *See Leach v. Commonwealth*, 129 Ky. 497, 112 S.W. 595, 597 (1908); *Holt v. Commonwealth*, Ky., 259 S.W.2d 463, 465 (1953); and *Parsley v. Commonwealth*, Ky., 306 S.W.2d 284 (1957).

8. Ky., 383 S.W.2d 139 (1964).

tation of such questioning will not constitute reversible error.[9]

Thus, *Current v. Columbia Gas of Kentucky* stands generally for the proposition that better practice is to prevent testimony as to exact details of compensation, but that the matter is within the trial court's sound discretion.

Our more recent brush with this issue occurred in *Underhill v. Stephenson*,[10] a case that dealt primarily with amendment of pleadings and whether the amendment relates back to the date of the original pleading. The issue here was touched upon, however, when the trial court denied a party the right to cross-examine a medical witness concerning a medical malpractice case that had been brought against him. We said:

> The Underhills had a right to cross-examine the medical expert on all matters relating to every issue. CR 43.06. Evidence to show bias of an expert witness is relevant.[11]

In an earlier time, the use of expert witnesses was limited and involved the occasional testimony of a physician, a professor, or some other person in the community who possessed specialized knowledge that would be of assistance to the trier of fact in understanding the case. In modern litigation, however, it would be difficult to overstate the importance of expert witnesses. Some of the most important decisions of the Supreme Court of the United States in recent years have dealt with the admissibility of expert opinion in an effort to assure its reliability,[12] and this Court has devoted considerable attention to issues relating to expert witnesses.[13] As demonstrated by the facts presented here, expert witnesses are often compensated handsomely and it is widely believed that they may be expected to express opinions that favor the party who engaged them and who pays their fees.

This issue was recently addressed by the high court of Maryland.[14] The claim was medical negligence and reversal was sought on grounds that the trial court had erred in allowing inquiry as to the amount of income earned by the expert witness and the approximate portion of the witness's total income derived from serving as an expert witness. In its analysis, the Court began with a review of the role of expert witnesses in British and American law. The Court observed that the participation of such witnesses had been viewed historically with a degree of distrust and that with the passage of time, that distrust had not dissipated. The Court recognized, however, that participation of such witnesses had become a fact of life and that certain expert witnesses derive a significant portion of their total income from testifying in litigation. As to the reason for allowing cross-examination of expert witnesses as to compensation, i.e. the relevance of such testimony, the Court explained as follows:

> Exposure of potential bias based on self-interest is often attempted through

9. *Id.* at 144.

10. Ky., 756 S.W.2d 459 (1988).

11. *Id.* at 461.

12. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); and *Weisgram v. Marley Co.*, 528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

13. *Fugate v. Commonwealth*, Ky., 993 S.W.2d 931 (1999); *Goodyear Tire & Rubber Co. v. Thompson*, Ky., 11 S.W.3d 575 (2000); and *Farmland Mutual Ins. Co. v. Johnson*, Ky., 36 S.W.3d 368 (2000).

14. *Wrobleski v. Nora de Lara*, 353 Md. 509, 727 A.2d 930 (1999).

cross-examination directed at how much the witness is being paid for his or her services in the case at bar, the frequency with which the witness testifies in similar kinds of cases, whether the witness customarily appears for a particular type of party (usually plaintiff or defendant), whether the witness is frequently employed by a particular party or attorney and, if so, how much income the witness derives from that employment, and, as in this case, the amount or the percentage of the witness's total income that is derived from lawyer referrals or testimony in lawsuits. Some forms of inquiry seek to uncover a specific and enduring relationship between the witness and the party or attorney, from which a direct bias may be inferred. Others are directed at exposing the more subtle problem of the professional "hired gun," who earns a significant portion of his or her livelihood from testifying and, rather than having a tie to a specific party or attorney, may have a general economic interest in producing favorable results for the employer of the moment.[15]

In final analysis, the Court of Appeals of Maryland held that the amount of money a witness is paid for testifying in a particular case is unquestionably disclosable on cross-examination. Other courts have reached similar conclusions[16] and we now join that view. To the extent *Current v. Columbia Gas of Kentucky* is to the contrary, it is overruled.

While we recognize that some courts have focused on the amount of fees, the frequency of giving expert testimony, whether a witness is a "professional witness," and other factors as a basis for determining whether the inquiry should be allowed, we believe a better approach would be to require the witness, upon proper inquiry, to inform the jury as to the amount of his or her compensation whether that amount be great or small. The jury, possessed of such information, will be in the best position to determine whether and to what extent the amount of compensation may affect the testimony of the witness. We are not unmindful of the concern expressed in *Current v. Columbia Gas of Kentucky* that allowing details of compensation might inject collateral matters into the trial, but the inquiry envisioned here, coupled with the trial court's discretionary authority to limit excessive cross-examination otherwise, will prevent the jury from being diverted from its mission of deciding the facts.

Our decision herein renders it unnecessary to decide whether the discovery depositions of Dr. Stoney and Dr. Page should have been read to the jury, nor need we decide whether the trial court erred when it excluded three of plaintiff's fact witnesses on grounds of failure to supplement a pre-trial compliance. As all such disclosures have now been made, the testimony of these witnesses, if otherwise admissible, should be admitted upon retrial.

For the foregoing reasons, this cause is reversed and remanded for a new trial consistent herewith.

All concur.

---

**15.** *Id.* at 517–18, 727 A.2d 930.

**16.** *See Sears v. Rutishauser*, 102 Ill.2d 402, 80 Ill.Dec. 758, 466 N.E.2d 210 (1984); *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47 (Mo.1999); *State v. Locklear*, 349 N.C. 118, 505 S.E.2d 277 (1998), *cert. denied*, 526.U.S. 1147, 119 S.Ct. 2025, 143 L.Ed.2d 1036 (1999); *Zamsky v. Pittsburgh Public Parking Authority*, 378 Pa. 38, 105 A.2d 335 (1954); and *Russell v. Young*, 452 S.W.2d 434 (Tex. 1970).