Daniel D. PRIMM, Jr., M.D., Appellant

v.

Sheila R. ISAAC, Judge, Fayette Circuit Court, et al., Appellees

and

Fansteel V/R Wesson; Larry S. Fraher; Rose M. Rhodus; and Steve Mueler, Real Parties in Interest.

No. 2002–SC–0344–MR.

Supreme Court of Kentucky.

Feb. 19, 2004.

20. *Thomas,* 57 S.W.3d at 267–69 (Keller, J., concurring). .

Barbara J. Bowers, Johann F. Herklotz, Piper, Wellman & Bowers, Lexington, for Appellant.

H. Brad Harris, Richard G. Griffith, Kelly Michelle Kaiser, Stoll, Keenon & Park, LLP, Lexington, for Appellee.

Opinion of the Court by Justice GRAVES.

This is the third in a recent continuum of cases concerning the extent to which a party can discover and prove the positional bias of an adverse party's expert witness. In *Tuttle v. Perry*, Ky., 82 S.W.3d 920 (2002), this Court held that a CR 35.01 [1]

---

1. "When the mental or physical condition (in-    cluding the blood group) of a party, or of a

examining physician can be questioned on cross-examination as to how much he or she charged for the examination, report and testimony in a specific case because "it is widely believed that [expert witnesses] may be expected to express opinions that favor the party who engaged them and who pays their fees." *Id.* at 923. In *Metropolitan v. Overstreet,* Ky., 103 S.W.3d 31 (2003), we further extended pretrial discovery, by proper means, and admission into evidence of: (1) the number of examinations and evaluations performed by the expert doctor on behalf of employers, insurance companies, and other defendants in the previous twelve months as compared to the number of patients seen for treatment purposes during the same period; (2) the expert's charge for each examination; and (3) the expert's charge for each deposition given as a result of an examination. *Metropolitan* also authorized the videotaping of a CR 35.01 examination.

Here, the issue is whether Dr. Primm, who was also the expert at issue in *Metropolitan,* can be compelled, prior to testifying, to produce his income tax records and other financial documents for examination by the opposing party's attorney for possible impeachment at trial. Hence, this case presents us with an issue that balances a litigant's need for discovery of impeachment evidence against a nonparty witness's perceived right of privacy with respect to his or her financial records.

In 1998, Appellant, Dr. Daniel D. Primm Jr., an orthopedic surgeon, performed an independent medical examination (IME)[2] of Appellee/Real Party in Interest, Rose M. Rhodus, at the request of her employer, Fansteel V/R Wesson (Fansteel). Rhodus' treating physician had previously determined that she was unable to work her regular five-day shift due to an alleged work-related injury. However, after examining Rhodus, Dr. Primm issued a written report finding that Rhodus was, in fact, able to return to her regular work schedule and recommending that she begin an exercise program. Because Dr. Primm's findings and recommendations conflicted with those of Rhodus' treating physician, Fansteel demanded that Rhodus either submit to a third examination by another physician designated by Fansteel or return to her regular shift. After Rhodus refused to do either, Fansteel terminated her employment. Rhodus thereafter filed a wrongful termination and disability discrimination action against Fansteel in the Fayette Circuit Court.

Prior to the date scheduled for Dr. Primm's deposition, Rhodus served on Dr. Primm's billing records custodian/officer manager a subpoena duces tecum demanding production of Dr. Primm's tax documents for his medical practice for the years 1997 to 1999. Specifically, the subpoena required production of tax returns, 1099 forms, W–2 and W–4 forms, and copies of all IMEs performed by Dr. Primm during the specified years, including the

person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician, dentist or appropriate health care expert, or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and

shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made." Kentucky Civil Rule 35.01.

2. While referred to as an IME, Rhodus was examined by Dr. Primm prior to any litigation, rather than pursuant to a CR 35.01 order.

billing invoices pertaining to such examinations. Dr. Primm thereafter filed an objection to the discovery and moved to quash the subpoena.

Following several hearings, the trial court ordered Dr. Primm to produce:

(1) A photocopy of that page from his 1998 tax return that reflects the amount of income derived from his medical practice as well as the page bearing his signature and a certification from his tax accountant that said amount as reflected on the tax return constituted the amount of income Dr. Primm derived from his medical practice in 1998.

(2) A copy of all invoices for 1998 litigation-related services including but not limited to depositions and independent medical examinations, with each invoice being chronologically numbered.

(3) Copies of the 1099 forms he received for his income derived from his medical practice in 1998, as well as a verified statement noting the extent to which each 1099 form relates to litigation-related services, including but not limited to depositions and IMEs. Each 1099 form must cross-reference the related invoice(s).

(4) The "day sheets" and "monthly sheets" from the financial records of his medical practice for the year 1998 which were mentioned in the testimony of Dr. Primm's office assistant.

The trial court further ordered that all patient information be redacted, and the documents be labeled "confidential" and filed under seal.

Dr. Primm filed a petition for a Writ of Prohibition in the Court of Appeals requesting that the trial court's discovery order be vacated in its entirety. In denying relief, the Court of Appeals adopted a two-pronged test recognized by several state and federal courts, i.e., that a trial court does not abuse its discretion in ordering production of a nonparty witness's tax records and documents if (1) there is a "compelling need" for the information, and (2) such information is not otherwise readily available. The Court of Appeals stated:

> [W]hen it comes to personal tax records, the trial court is required to balance the potential invasion of privacy of the individual required to release the documents against the interest and the need of the party seeking to discover those documents. The federal courts have decided that a person has a qualified privilege to the confidentiality of personal tax records. This means that the documents may be discoverable, but only after the trial court has conducted an analysis of the need for the information, its materiality and its relevancy.

The Court of Appeals concluded that the trial court did, in fact, balance the competing interests and thus, did not abuse its discretion in finding that Rhodus demonstrated a compelling need for the documents as well as a lack of a substantial equivalent or other means of obtaining the desired information. Dr. Primm thereafter appealed to this Court as a matter of right.

■ While we have recently addressed the discoverability of an expert's income related to litigation services, there is no Kentucky precedent on whether actual income tax or other financial documents of a nonparty are discoverable. Although, as noted by the Court of Appeals, some federal and state courts recognize a qualified privilege protecting personal financial records and prohibiting discovery absent some compelling need, *see Morris v. Craddock*, 530 So.2d 785, 787–788 (Ala.1988), no specific privilege for tax records exists in

our civil rules, evidence rules, or in the Internal Revenue Code. And, CR 45.04(1) clearly provides that a nonparty witness can be compelled to produce at a deposition pursuant to subpoena duces tecum, "books, papers, documents, or tangible things which constitute or contain matters within the scope of the examination permitted by Rule 26.02."

■ Generally, control of discovery is a matter of judicial discretion. *See Wal–Mart Stores, Inc. v. Dickinson,* Ky., 29 S.W.3d 796 (2000); *Morrow v. Brown, Todd & Heyburn,* Ky., 957 S.W.2d 722 (1997). Kentucky Civil Rule 26.02, Scope of discovery, provides, in part:

(1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

■ It is well-settled that discovery rules are to be liberally construed so as to provide both parties with relevant information fundamental to proper litigation. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Proof that tends to expose a motivation to slant testimony one way or the other satisfies the requirement of relevancy. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook,*

§ 4.15, p. 183 (Michie 3rd ed. 1993) "The interest of a witness, either friendly or unfriendly, in the prosecution or in a party is not collateral and may always be proved to enable the jury to estimate credibility. It may be proved by the witness' own testimony upon cross-examination or by independent evidence." *Motorists Mutual Insurance Co v. Glass,* Ky., 996 S.W.2d 437, 447 (1997). In *Wrobleski v. de Lara,* 353 Md. 509, 727 A.2d 930, 933 (1999), the Maryland Court of Appeals noted:

Expert opinion testimony can be powerful evidence. In some cases and on certain issues, it is essential to have in order to present a trial issue, but even if not legally required, it can have a compelling effect with a jury. That is why, especially with expert witnesses, "wide latitude must be given a cross-examiner in exploring a witness's bias or motivation in testifying," why, in particular, "the cross-examiner must be given latitude to cross-examine a witness concerning any bias or interest the witness may have that would lead the witness to shade his testimony, whether consciously or not, in favor or against a party." (*Quoting Ware v. State,* 348 Md. 19, 702 A.2d 699 (1997).)

■ No intellectually honest argument can be made that Dr. Primm's activities as a defense expert are not relevant to impeachment for bias. We have held as much in *Tuttle* and *Metropolitan.* However, the mere fact that such information may fall within the scope of discovery does not mean that parties are entitled to unfettered discovery of impeachment evidence by whatever means they seek. Legitimate issues are raised concerning the extent of discovery sought in this case and the potential harm that could result from compelling a nonparty to produce perhaps sensitive financial documents. Dr. Primm argues that requiring a nonparty expert

witness to produce income tax and patient records exceeds the allowable scope of discovery because any probative value is far-outweighed by the prejudicial and burdensome effects of such a request. Here, the trial court has ordered production of records pertaining to the gross income earned from Dr. Primm's medical practice, with the direction that not only must he specify which documents pertain to litigation-related services, but also that he cross-reference each tax form with the correlating billing invoice.

Rhodus, on the other hand, contends that *all* of the financial information she seeks is discoverable because it is relevant and will facilitate effective inquiry into Dr. Primm's alleged bias. Rhodus maintains that Dr. Primm is not an independent medical examiner, but rather a professional defense witness who was selected by Fansteel to create a "pretext to dishonor the work limitations" imposed by her treating physician, and ultimately to terminate her employment. As such, Rhodus claims that Dr. Primm's bias in this case is a crucial issue that can be revealed only by access to the tax returns and IME records to verify or contradict Dr. Primm's anticipated testimony.

Dr. Primm directs this Court to the Florida Supreme Court's decision in *Elkins v. Syken,* 672 So.2d 517 (Fla.1996). *Syken* concerned two cases in which the trial courts had issued orders directing defendants' expert witnesses, who were physicians, to produce income tax records, and records regarding patients who were examined for purposes of litigation in unrelated actions. In a unanimous en banc decision, the Third District Court of Appeals quashed the trial court's orders, concluding they were too burdensome and set forth the following criteria to be followed in discovering financial information from opposing medical experts:

1. The medical expert may be deposed either orally or by written deposition.

2. The expert may be asked as to the pending case, what he or she has been hired to do and what the compensation is to be.

3. The expert may be asked what expert work he or she generally does. Is the work performed for the plaintiffs, defendants, or some percentage of each?

4. The expert may be asked to give an approximation of the portion of their [sic] professional time or work devoted to service as an expert. This can be a fair estimate of some reasonable and truthful component of that work, such as hours expended, or percentage of income earned from that source, or the approximate number of IMEs that he or she performs in one year. The expert need not answer how much money he or she earns as an expert or how much the expert's total annual income is.

5. The expert may be required to identify each case in which he or she has actually testified, whether by deposition or at trial, going back a reasonable period of time, which is normally three years. A longer period of time may be inquired into under some circumstances.

6. The production of the expert's business records, files, and 1099's [sic] may be ordered produced upon the most unusual or compelling of circumstance.

7. The patient's privacy must be observed.

8. An expert may not be compelled to compile or produce nonexistent documents.

*Syken v. Elkins,* 644 So.2d 539, 546 (Fla. Dist.Ct.App.1994).

The district court concluded that the information elicited using the above guidelines would be sufficient to show an expert's background and orientation, and, with minimal cross-examination, make it perfectly clear to a jury that "a defense doctor testifies as a defense doctor, and [a] plaintiff's doctor testifies as a plaintiff's doctor, and that each may spend considerable time doing just that." *Id.* at 547.

In affirming the district court, the Florida Supreme Court held:

> Discovery was never intended to be used as a tactical tool to harass an adversary in a manner that actually chills the availability of information by non-party witnesses; nor was it intended to make the discovery process so expensive that it could effectively deny access to information and witnesses or force parties to resolve their disputes unjustly. To allow discovery that is overly burdensome and that harasses, embarrasses, and annoys one's adversary would lead to a lack of public confidence in the credibility of the civil court process.... In essence, an overly burdensome, expensive discovery process will cause many qualified experts, including those who testify only on an occasional basis, to refrain from participating in the process, particularly if they have the perception that the process could invade their personal privacy.

*Elkins v. Syken, supra,* 672 So.2d at 522.

The enunciation of the *Syken* guidelines was a notable retreat from earlier Florida decisions perceived as having gone too far in permitting burdensome inquiry into the financial affairs of expert witnesses, providing information which "serves only to emphasize in unnecessary detail that which would be apparent to the jury on the simplest cross-examination: that certain doctors are consistently chosen by a particular side in personal injury cases to testify on its respective behalf." *LeJeune v. Aikin,* 624 So.2d 788, 790 (Fla. 3rd Dist.Ct.App. 1993) (Schwartz, C.J., concurring). *See Bissell Brothers, Inc. v. Fares,* 611 So.2d 620 (Fla. 2nd Dist.Ct.App.1993) (1099 forms of independent medial examiners subject to discovery as reasonably calculated to lead to relevant evidence of bias); *Young v. Santos,* 611 So.2d 586 (Fla. 4th Dist.Ct.App.1993) (order compelling discovery of doctor's bills, checks, and payment records pertaining to IMEs performed at request of insurance companies or law firms, as well as tax returns for a three-year period); *Wood v. Tallahassee Memorial Regional Medical Center, Inc.,* 593 So.2d 1140 (Fla. 1st Dist.Ct.App.1992) (order compelling discovery of tax returns for previous five years reflecting income from medical malpractice cases).

Without question, Dr. Primm's income derived from conducting IMEs and other litigation-related services is relevant to the issue of bias. *Metropolitan, supra.* Further, since Fansteel relied on Dr. Primm's report to support its decision to terminate Rhodus, we agree with the Court of Appeals' conclusion that "any evidence of his bias or prejudice is material to Rhodus's theory of her case, arguably even more so than it would be if Dr. Primm's sole involvement herein was the performance of an IME after the filing of her action against Fansteel." Nevertheless, there must be a point beyond which inquiry is to be considered too prejudicial and intrusive. While Rhodus has a right to discover information that might be necessary to impeach Dr. Primm, Fansteel has a corresponding right to choose its expert witness and not have such witness burdened to the extent that the witness will refuse to testify.

"Permitting routine disclosure of the expert's gross compensation, from all

sources—including those unrelated to litigation activities—would provide the jury with little information relevant to a fair assessment of the expert's credibility, while concomitantly introducing the real possibility of creating confusion, distraction and even prejudice." *Behler v. Hanlon,* 199 F.R.D. 553, 562 (D.Md.2001). Instead, the jury should be able to assess possible bias on the part of an expert witness if it is made aware of the amount and percentage of gross income attributable to providing expert witness services. There is no need for the expert to produce tax returns if the party seeking discovery has accurate information regarding the percentage of income earned as an expert.

In *Mohn v. Hahnemann Medical College & Hospital,* 357 Pa.Super. 173, 515 A.2d 920, 924 (1986), the Pennsylvania Superior Court held that requiring an expert to "lift his visor so the jury could see who he was, what he represented, and what interest, if any, he had in the results of the trial so that the jury could appraise his credibility" did not encompass "the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny." Similarly, in *Allen v. Superior Court,* 151 Cal.App.3d 447, 198 Cal.Rptr. 737 (1984), the California Court of Appeals held that the trial court erred in requiring production of a defense medical expert's financial and income documents prior to his deposition and without a showing that the information could not be obtained through less intrusive means. "At deposition, the medical expert may be asked questions directed toward disclosing what percentage of his practice involves examining patients for the defense and how much compensation he derives from defense work. To show bias or prejudice, [Plaintiff] need not learn the details of his billing and accounting...." *Id.* at 741. *See also State ex rel. Acme Rug Cleaner, Inc. v. Likes,* 256 Neb. 34, 588 N.W.2d 783 (1999) (Nebraska Supreme Court adopted guidelines similar to *Syken, supra*); *Russell v. Young,* 452 S.W.2d 434 (Tex.1970).

■ The views of this Court obviously diverge from the *Syken* courts with respect to the admissibility of the amount of income an expert receives through litigation-related services. We are of the opinion that an expert can be questioned not only as to the percentage of income attributable to IME and other litigation-related services, but also the total amount of income derived from such activities. However, we do agree with *Syken* that an expert's gross income, billing practices and other financial documents should not be subject to routine disclosure. Here, Dr. Primm's gross income, including that derived from his treatment of patients, is wholly irrelevant to his activities as a defense witness, and would likely have no effect other than to possibly prejudice a jury against him.

When the interest of a party in discovering relevant facts conflicts with the right of others to maintain reasonable privacy with respect to financial matters, a trial court must engage in careful scrutiny of the real needs of the party who seeks discovery. *Allen, supra,* at 741. The Court of Appeals opined that the trial court properly balanced the competing interests in finding that Rhodus had demonstrated a compelling need for the information and that such was not otherwise available absent production of the documents in question. However, the lower courts have failed to distinguish between the need for and access to the documents and the need for and access to the information. Certainly, Dr. Primm's income tax returns and billing records are personal to him and not obtainable through other means. However, the information necessary to demonstrate bias, i.e., the amount and percentage of Dr.

Primm's income attributable to litigation-related activities, is likely readily available through oral or written deposition, without the intrusive and improper examination of Dr. Primm's 1099 forms, income tax returns, and billing invoices. As Rhodus has yet to take Dr. Primm's deposition and question him about the sought-after information, the least burdensome route of discovery was simply not followed.

Rhodus suggests that Dr. Primm has been successful in secreting information concerning his litigation-related activities and the income derived there from. The Court of Appeals, citing *Sexton v. Bates,* Ky.App., 41 S.W.3d 452 (2001), similarly made such an allegation. We conclude, however, that there is no indication Dr. Primm has refused to divulge his income with respect to litigation-related services. In fact, the record contains a chart depicting Dr. Primm's income derived from IMEs and depositions, including the percentage of total patients examined for that purpose. Although the chart does not provide Dr. Primm's gross income, it is only a matter of simple multiplication to arrive at such number. Furthermore, in the *Metropolitan* case, we referred to an earlier deposition of Dr. Primm, wherein he had testified concerning his income:

> In the *Votaw* case, Dr. Primm testified by deposition that in the year 2001, his CR 35.01 examinations amounted to approximately ten to fifteen percent of his practice. Dr. Primm estimated that he saw between thirty-five and seventy patients per week. Therefore, it may be estimated that he conducted between 3.5 (10% of 35) and 10.5 (15% of 70) CR 35.01 examinations per week. In general, he charged between $410.00 and $625.00 for each such examination, including the cost of x-rays. He was required to give a deposition in about one-third of such cases, and Appellees estimated that his charge for each deposi-

> tion ranged from $650.00 to $900.00. Dr. Primm testified that he was "slowing down" in 2001 and working only forty to forty-two weeks per year. Thus, based on forty weeks of work in 2001, it could be estimated for purposes of the petition that Dr. Primm earned annually between $83,400.00 (assuming 3.5 examinations per week at $410.00 and one deposition at $650.00) and $370,500.00 (assuming 10.5 examinations per week at $625.00 and three depositions at $900.00) for his CR 35.01 work.

> [Dr. Primm] conceded that during a 1993 deposition he testified that he worked fifty weeks per year and CR 35.01 examinations constituted as much as twenty-five percent of his practice. Thus, Dr. Primm earned as much as $832,500.00 annually from such examinations at that time....

*Metropolitan, supra,* at 41–42.

Discovery should be limited to its purpose and not permitted to routinely and unnecessarily expand into needless exposure of superfluous matters and information that are personal to the witness and have no real relevancy to his or her credibility. Further, "[t]he privacy of the expert as to personal finances, professional associations, and patients/clients should be respected and should be invaded only as necessary to insure the honesty and accountability of the expert in responding to legitimate inquiries." *State ex rel. Creighton v. Jackson,* 879 S.W.2d 639, 643 (Mo. App.1994) (*quoting State ex rel. Lichtor v. Clark,* 845 S.W.2d 55, 66 (Mo.App.1992)). Given the information already disclosed concerning Dr. Primm's litigation income, we must conclude that the information sought and the manner in which it has been requested is not only duplicative, but also so burdensome as to create a chilling effect on a litigant's ability to find experts

to testify as witnesses. It is unreasonable to compel experts to produce financial documents prior to any attempt to obtain the information through a less intrusive, burdensome, and costly means.

■ We hasten to add, however, two important caveats. First, we do not intend by our decision today to preclude discovery of a nonparty witness's financial documents. There may be cases where tax returns and other documents relating to expert's activities should be compelled upon a trial court's finding that the witness has been less than forthcoming about the information. If, after taking the deposition, a party can demonstrate that additional information is necessary to undertake reasonable bias impeachment, it may seek leave of court to take additional discovery. Further, should the trial court determine that the witness has not provided complete and unevasive answers to the deposition questions, or "has falsified, misrepresented, or obfuscated the required data, the aggrieved party may move to exclude the witness from testifying or move to strike that witness's testimony and, or further, move for the imposition of costs and attorney's fees in gathering the information necessary to expose the miscreant expert." *Syken, supra,* 644 So.2d at 547.

Second, as aptly noted by the Florida Supreme Court, it is important to recognize that the issue herein affects plaintiffs and defendants alike. Thus, our opinion "will provide protection to experts for both plaintiffs and defendants by preventing the unnecessary and overly burdensome disclosure of personal financial information and by forestalling any chilling effect on the availability of expert witnesses." *Syken, supra,* 672 So.2d at 519.

Accordingly, we reverse the decision of the Court of Appeals and remand this case to the Court of Appeals with directions to grant the writ of prohibition and direct the Fayette Circuit Court to grant discovery only in accordance with this opinion.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, STUMBO, and WINTERSHEIMER, JJ., concur.

KELLER, J., concurs in part and dissents in part by separate opinion.

KELLER, Justice, concurring in part and dissenting in part.

I agree wholeheartedly with the majority's conclusion that an expert witness can be questioned both as to the percentage of income attributable to his or her services as an expert witness or consultant and as to the total amount of income that he or she derives from such services.[1] Armed with *accurate* answers to questions concerning those two (2) topics, a jury should be able to assess any possible bias on the part of the expert witness that results from the witness's compensation by the party who retained him or her. In recognition of that fact, I similarly agree with the majority's conclusion that an expert witness's total gross income from all sources should not be subject to routine disclosure through discovery.[2] The major-

---

1. *Primm v. Isaac,* Ky., 127 S.W.3d 630, 637 (2004) ("[A]n expert can be questioned not only as to the percentage of income attributable to IME and other litigation-related services, but also the total amount of income derived from such activities."); *Id.* at 637 ("[T]he jury should be able to assess possible bias on the part of an expert witness if it is made aware of *the amount and percentage of gross income attributable to providing expert witness services."* (emphasis added)).

2. *Id.* at 637. Given correct answers to the two (2) questions, it is a simple mathematical task to determine the expert's gross income from his profession, *i.e.,* the jury need only divide the total amount of income derived

ity opinion, however, fails to recognize that deposition questioning alone may be insufficient to ensure that a jury receives *accurate* information regarding the extent of an expert witness's compensation. In my opinion, the Court of Appeals "hit the nail on the head" in this case when it observed in its opinion below that "[s]ince a party is entitled to conduct a fair and complete cross-examination of an expert witness chosen by her adversary, that party is also entitled to [ ] pursue [fully] the discovery of relevant evidence that has the tendency to assist that process." As such, I part company with the majority's ultimate holding that the trial court improperly permitted the plaintiff in this case to seek verification of Dr. Primm's accounting of his compensation as an expert witness through discovery of portions of his tax returns and financial records. Accordingly, I respectfully concur in part and dissent in part in that I would permit discovery of the documents described in items one (1) and three (3) of the trial court's Order Regarding Primm Discovery and would remand this case to the Court of Appeals for it to issue a more limited writ than the one ordered by the majority opinion, *i.e.*, one prohibiting the trial court from permitting discovery, at this time, of the materials described in items number two (2) and four (4) of its discovery order.

The Kentucky Rules of Civil Procedure authorize the issuance of a subpoena duces tecum to "command the person to whom it is directed to produce and permit inspection and copying of designated books, papers, documents, or tangible things which constitute or contain matters within the scope of the examination permitted by Rule 26.02[.]" [3] CR 26.02(1) itself broadly defines the scope of permissible discovery: "[p]arties may obtain discovery regarding *any matter, not privileged, which is relevant to the subject matter involved in the pending action,* whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]" [4] The proper purpose of obtaining accurate information as to the percentage and amount of income that a witness receives from his or her services as an expert witness is not to annoy or embarrass the witness or to invade unnecessarily the witness's legitimate privacy interests, but rather, to expose bias or any personal interest the witness may have that affected his or her stated opinion—in other words, to discover *relevant* evidence. "[E]vidence of bias or lack of bias is substantive, rather than collateral" [5] and "it may be developed on direct examination,

---

from such services by the percentage of total overall income those services represent. (I disagree, however, with the majority's suggestion that Dr. Primm's total income from his medical practice can be extrapolated from the chart attached to Appellant's brief, which depicts "Dr. Primm's income from IME's and depositions, including the percentage of total patients examined for that purpose[,]" *id.* at 638, because, without evidence that Dr. Primm's charges for litigation-related examinations are commensurate with his charges for the other examinations he performs, it is a hasty generalization to assume that "the percentage of total patients" is equivalent to the percentage of his total income.) And to verify the expert's percentage answer, it is necessary

to know both the income from services as an expert and the gross income from the expert's profession. Income from other sources, however, is unnecessary to this inquiry and—as it has slight probative value in exposing bias, particularly in cases such as this, where the professional income alone is substantial—I agree with the majority that an expert's gross income from all sources is not discoverable as a matter of course.

**3.** CR 45.04(1).

**4.** CR 26.02 (emphasis added).

**5.** *United States v. Fusco,* 748 F.2d 996, 998 (5th Cir.1984).

as well as cross-examination, just like any other substantive evidence."[6] Stated differently, "[t]he potential bias of a witness is always relevant testimony[,]"[7] and therefore, it may be excluded only "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[8] In the present case, no claim has been made—and no reasonable claim could be made—that evidence of Dr. Primm's possible bias should be excluded. And, in my opinion, there are no countervailing concerns such as "annoyance, embarrassment, oppression, or undue burden or expense"[9] that should prevent the plaintiff from discovering the financial documents that are not only necessary to verify or disprove Dr. Primm's own calculations, but are themselves relevant evidence for a jury to consider in determining the credibility it should assign to Dr. Primm's opinion.

The facts of this case furnish ample reasons for permitting independent verification of an expert's answers when verification is readily available. Dr. Primm's testimony in the *Votaw* case,[10] as set forth in the majority opinion, was that, in 2001, ten percent (10%) to fifteen percent (15%) of his practice was devoted to CR 35.01

examinations and that he earned either a low of $83,400.00 or a high of $370,500.00 from his services as an expert. Additionally, in the chart attached to Appellant's brief and referred to in the majority's opinion,[11] Dr. Primm's services as an expert are shown as representing twenty percent (20%) to twenty-five percent (25%) of his medical practice over an unspecified time frame, and he is therefore shown as earning somewhere between $543,750.00 and $725,000.00 from such services. Is someone who receives $83,400.00 a year from performing CR 35.01 examinations and testifying on behalf of defendants as biased as someone who receives $725,000.00 from such litigation-related services? That is a question for the jury to decide, and in order to do so, it needs to know the actual extent to which the expert's professional income is derived from such litigation-related services, *i.e.*, whether the witness receives $83,400.00 or $725,000.00 from such services in a given year.[12] Hopefully, Dr. Primm's previous disclosures regarding his litigation-related income do not typify the "accurate information"[13] that the majority anticipates from experts.

If an expert accurately answers deposition questions regarding (1) the percentage of income attributable to his or her expert services and (2) the total amount of

6. *Id.*

7. *United States v. Powell,* 124 F.3d 655, 661 (5th Cir.1997); *Underhill v. Stephenson,* Ky., 756 S.W.2d 459, 461 (1988) ("Evidence to show bias of an expert witness is relevant."); KRE 104(e) ("This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility, including evidence of *bias,* interest, or prejudice." (emphasis added)).

8. KRE 403.

9. CR 26.03(1).

10. *Votaw v. Anchor Foods,* No. 98–CI–000489, 2001 WL 1782235 (Scott Cir. Ct.2001).

11. *Id.*

12. *Tuttle v. Perry,* Ky., 82 S.W.3d 920, 922 (2002) ("As a primary responsibility of a jury is to determine the weight of evidence and the credibility of witnesses, KRE 104(e) declares that the rule does not limit the right of a party to introduce evidence relevant to weight or credibility 'including evidence of bias, interest or prejudice.' " (footnotes omitted)).

13. *Primm,* 127 S.W.3d at 637.

income that he or she derives from such services, an order that requires that expert to produce redacted tax and financial records, which would only verify the answers otherwise provided through discovery,[14] would not cause the expert to suffer embarrassment nor would it invade the expert's privacy interests. In this case, the relevant inquiries can be accomplished if Dr. Primm produces (1) copies of 1099's that he received from those paying for his expert services and (2) a redacted copy of the applicable schedule of an income tax return that shows only his name and the gross income from his medical practice. Thus, in my view, items one (1) and three (3) of the trial court's discovery order properly required Dr. Primm to provide the documents containing that information.[15] The materials covered by items (2) and (4) of the trial court's discovery order, *i.e.*, copies of invoices for litigation-related services and daily and monthly financial records, would no doubt assist the plaintiff in verifying whether Dr. Primm had included all 1099 forms as item (3) required. However, with all due deference to the

trial court's discretion,[16] unless there is evidence that a witness's 1099 disclosures were incomplete, requiring production of the materials described in items two (2) and four (4) would be excessive, and I agree with Dr. Primm's contention that he was entitled to a protective order as to these discovery requests.[17]

Trials today are too often a battle of expert witnesses, and juries are called upon to decide which expert's testimony to accept. As is the case with any witness, evidence relating to an expert witness's potential bias is important for the jury's consideration in determining both the credibility and the weight of an expert witness's testimony. Recently, in *Tuttle v. Perry*,[18] this Court held that it was permissible to cross-examine expert witnesses regarding their compensation in an individual case, and we quoted approvingly from Maryland's highest court's opinion in *Wrobleski v. de Lara*,[19] which had previously held that the amount of money a witness is paid for testifying is proper grounds for cross examination. The *Wrobleski* Court

---

14. I disagree with the majority's suggestion that the routine practice of taking discovery depositions of expert witnesses obviates the need for "more burdensome" forms of discovery. *See Primm*, 127 S.W.3d at 637 ("As Rhodus has yet to take Dr. Primm's deposition and question him about the sought after information, the least burdensome route of discovery was simply not followed."). First, CR 26.04 provides that "methods of discovery may be used in any sequence[.]" Second, the majority's suggestion overlooks the fact that the plaintiff seeks discovery of Dr. Primm's tax information and financial records primarily in order to *verify* his expected deposition testimony.

15. I note that the trial court's discovery order provides that "[a]ll records to be produced as hereinbefore designated shall be labeled "CONFIDENTIAL", shall be produced UNDER SEAL, and shall be utilized only in connection with the above referenced case; it is further ordered that said information and

documentation shall not be disseminated to anyone or to any entity except upon further Orders of this court[.]" I would observe, however, that, if Dr. Primm so requested, CR 26.03(1) would permit the trial court to afford even greater protection for his privacy by ordering that the documentation that he furnished be filed under seal for an *in camera* inspection by the trial judge who would then determine if Dr. Primm accurately answered the questions and release the documents to the plaintiff only if the trial judge found discrepancies between Dr. Primm's deposition testimony and financial records.

16. *Metropolitan Property & Cas. Ins. Co. v. Overstreet*, Ky., 103 S.W.3d 31, 36 (2003).

17. CR 26.03(1).

18. Ky., 82 S.W.3d 920 (2002).

19. 353 Md. 509, 727 A.2d 930 (1999).

added two (2) important caveats to its holding that warrant repetition:

First, we do not intend by our decision today to authorize the harassment of expert witnesses through a wholesale rummaging of their personal and financial records under the guise of seeking impeachment evidence. The allowance of the permitted inquiry, both at the discovery and trial stages, should be tightly controlled by the trial court and limited to its purpose, and not permitted to expand into an unnecessary exposure of matters and data that are personal to the witness and have no real relevance to the credibility of his or her testimony. Second, the fact that an expert witness devotes a significant amount of time to forensic activities or earns a significant portion of income from those activities does not mean that the testimony given by the witness is not honest, accurate, and credible. It is simply a factor that is proper for the trier of fact to know about and consider.[20]

I fully agree with both of these caveats, and, in my view, if the permissible discovery were limited to the documents identified in items one (1) and three (3) of the trial court's order, Dr. Primm would neither be harassed nor have his privacy unnecessarily invaded. Further, given that Dr. Primm would have to consult these same tax and financial documents in order to give a complete and truthful answer to questions that this Court has found relevant and that will no doubt be asked of him at his deposition, the trial court's discovery order that required Dr. Primm to provide copies of the underlying documents themselves is in no way "unreasonable and oppressive."[21]

I wish to emphasize that I have no reason to doubt that Dr. Primm's testimony is honest, accurate, and credible. But, no witness has the right to testify without challenge to his or her answers. Cross-examination has been accurately described as the " 'greatest legal engine ever invented for the discovery of truth.' "[22] Only through meaningful cross-examination, however, will the jury be able to assess a witness's credibility and the weight to assign to the witness's testimony. And meaningful cross-examination can only occur when the opposing party is allowed access to relevant information. In my view, the majority's holding, which can be distilled to a determination that experts' answers to questions regarding positional bias now must be taken at face value, represents a retreat from full disclosure of a witness's potential bias. Accordingly, today's majority opinion subverts the goal of ensuring that juries receive *accurate* information as to potential sources of bias, and I dissent in part because I believe that, in order to ensure meaningful cross-examination in this case, the plaintiff should be permitted to discover the financial and tax documents that are necessary to verify or disprove Dr. Primm's own accounting of his financial ties to insurance companies and defense lawyers.

---

20. *Id.* at 938.

21. CR 45.02.

22. *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (quoting 5 Wigmore § 1367).