905 A.2d 482

**Barbara A. COOPER**

v.

**Loretta SCHOFFSTALL**

**Appeal of Perry̆ A. Eagle, M.D.**

Supreme Court of Pennsylvania.

Argued May 16, 2005.

Decided Sept. 7, 2006.

506

Curtis N. Stambaugh, Esq., Susan V. Metcalfe, Esq., David E. Lehman, Esq., Harrisburg, for Perry A. Eagle, M.D.

David B. Dowling, Esq., James J. Jarecki, Esq., Harrisburg, for Barbara A. Cooper.

John Andrew Statler, Esq., Thomas Edward Brenner, Esq., Heather L. Paterno, Esq., Harrisburg, for Loretta Schoffstall.

Scott B. Cooper, Esq., James Richard Ronca, Esq., Harrisburg, for PA Trial Lawyers Association.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice SAYLOR.[1]

This appeal concerns the availability, in a civil case, of discovery of financial records of a non-party expert medical witness to facilitate an inquiry into potential bias.

In December 2001, Barbara A. Cooper commenced a civil action against Loretta Schoffstall arising out of a pedestrian/automobile accident. On the request of Ms. Schoffstall and/or her liability insurer, an independent medical examination of Ms. Cooper was performed by Appellant, orthopedic surgeon Perry A. Eagle, M.D.

Apparently in view of Dr. Eagle's known, extensive participation in defense medical examinations in the past, Ms. Cooper sought discovery of certain of his financial records pertaining to these activities, indicating that the effort was intended to probe potential favoritism toward the defense or, more generally, the insurance industry. *See generally* Pa. R.Civ.P. Nos. 4009.21–4009.27 (prescribing the procedure for obtaining production of documents from a non-party). Over Ms. Schoffstall's opposition, ultimately Ms. Cooper was successful in serving a subpoena upon Dr. Eagle requiring the production of copies of federal form 1099 tax records associat-

1. This case was reassigned to this author.

ed with his performance of services as an independent contractor for calendar years 1999, 2000, and 2001, in undertaking "defense-related reports, examinations and depositions." [2] Dr. Eagle and Ms. Schoffstall responded with motions seeking protective orders. Dr. Eagle contended, *inter alia*, that, to the extent that the discovery demand sought information related to payments made by other persons or firms entirely unrelated to the parties, counsel, or the insurer involved in the present case, it exceeded the bounds of permissible discovery as constrained by *Zamsky v. Public Parking Auth. of Pittsburgh*, 378 Pa. 38, 105 A.2d 335 (1954) (holding, in a condemnation case, that it was error to question the condemning authority's expert witness concerning fees that he had received over a five-year period for services rendered in connection with the acquisition of other parcels), and *Mohn v. Hahnemann Med. College & Hosp. of Phila.*, 357 Pa.Super. 173, 515 A.2d 920 (1986) (holding that a trial court committed reversible error in permitting cross-examination of a defense medical witness regarding his receipt of fees for medicolegal services other than in the litigation under review). *See* Motion of Perry A. Eagle, M.D. for Protective Order, at 5 ("Discovery into other professional work performed in other matters involving entirely different parties and counsel surely extends into such collateral territory that no reasoned basis exists for permitting the discovery excursions sought by this Plaintiff."). To the degree that the discovery would be permitted, Dr. Eagle sought confidential treatment of his financial information.

At a conference before the common pleas court, per the Honorable Richard A. Lewis, Ms. Cooper's counsel produced a collection of excerpts from the records of a number of prior civil actions in which Dr. Eagle conducted independent medical examinations on the request of the defense and/or testified on behalf of the defendant. These documents were offered to support Ms. Cooper's contention that Dr. Eagle performed

**2.** Federal form 1099 reports miscellaneous income for individuals and entities that received payment of at least $600 for non-employee services during a given calendar year.

abundant defense medical examinations (on the order of 200 to 400 in some recent years), derived substantial income from this work, and issued written reports containing repetitive, predictable, defense-favored observations and conclusions. Judge Lewis denied the motions for protective order, but separately entered an order requiring confidential treatment of financial information to be produced by Dr. Eagle.

Upon the filing by Dr. Eagle of a notice of appeal,[3] Judge Lewis issued a memorandum opinion setting forth his reasoning, pursuant to Rule of Appellate Procedure 1925(a). *See Cooper v. Schoffstall*, No. 5932 CV 2001, *slip op.* at 5–6 (C.P. Dauphin Dec. 15, 2003). As background, he explained that a party generally is entitled to discovery regarding any matter, not privileged, that is relevant to the litigation's subject matter and will substantially aid in advancing claims or defenses. *See* Pa.R.Civ.P. No. 4003.1. Judge Lewis also indicated, however, that Pennsylvania Rule of Civil Procedure 4003.5 ("Discovery of Expert Testimony. Trial Preparation Material") generally limits the scope of expert discovery to the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for opinions. Nevertheless, he reasoned that a court may permit additional discovery from an expert witness under an express exception to Rule 4003.5's general rule, "[u]pon cause shown." *See* Pa.R.Civ.P. No. 4003.5(a)(2).

Judge Lewis was persuaded that Ms. Cooper had demonstrated cause to support directed discovery of the limited financial records within the scope of the subpoena, since the documents might be relevant to show bias. In this regard, he relied upon Ms. Cooper's informal submission as demonstrating that Dr. Eagle performs defense medical examinations, prepares written reports, and testifies at court proceedings with "high frequency." *Id.* at 6. Referencing a passage from *Brady v. Ballay, Thornton, Maloney Med. Assoc., Inc.*, 704

**3.** Although the appeal was interlocutory relative to the underlying civil action, Dr. Eagle proceeded as of right under the collateral order doctrine. *See Ben v. Schwartz*, 556 Pa. 475, 481–83, 729 A.2d 547, 550–52 (1999).

A.2d 1076 (Pa.Super.1997), for the proposition that a party may impeach an expert witness by demonstrating partiality, Judge Lewis reasoned that, "since it is proper to show that an expert witness has a bias in favor of a specific party, it is possible to show that an expert has a bias in favor of a class of parties." *Cooper*, No. 5932 CV 2001, *slip op.* at 6. Additionally, he observed that discovery is tethered more closely to the subject matter of the litigation than it is to the question of admissibility at trial. *Accord George v. Schirra*, 814 A.2d 202, 205 (Pa.Super.2002) ("[T]he relevancy standard during discovery is necessarily broader than it is for admission at trial."). Judge Lewis also was not persuaded by arguments advanced by Dr. Eagle that the discovery that he had approved was burdensome, harassing, and annoying, or would have a chilling effect on doctors' willingness to perform independent medical examinations. Finally, he referenced decisions of other courts that he viewed as being consistent with his approach. *See Cooper*, No. 5932 CV 2001, *slip op.* at 4–6 (citing *Kogod v. Spangler*, No. 1:CV–97–0608, *slip op.* (M.D.Pa. Dec. 17, 1997), and *Clifford v. Leonardi*, 99 CV 4236, *slip op.* (C.P. Lackawanna Oct. 3, 2002)).

Dr. Eagle sought and obtained from Judge Lewis a stay pending appeal relative to enforcement of subpoena.

A three-judge panel of the Superior Court affirmed in a memorandum opinion, finding that Judge Lewis properly exercised his discretion in directing the production of 1099 forms received by Dr. Eagle. *See Cooper v. Schoffstall*, No. 1164 MDA 2003, *slip op.*, 2004 WL 1969347 (Pa.Super. July 14, 2004). The panel's reasoning, however, departed in material respects from Judge Lewis's approach. In particular, whereas Judge Lewis read Rule 4003.5 as circumscribing all discovery from experts, the panel indicated that Rule 4003.5 addresses only facts and opinions acquired or divulged in anticipation of litigation and is not applicable to inquiries into potential bias on the part of expert witnesses. *See id.* at 4, 2004 WL 1969347, at *2. Rather, the panel indicated, discovery of information of this nature falls within the broad, general scope of discovery under Rule 4003.1. *See id.*

Further, the Superior Court panel rejected Dr. Eagle's contention that, under the *Zamsky* and *Mohn* decisions, an expert may not be examined at trial concerning payments received from sources other than the parties themselves. In this regard, the Superior Court referenced, *inter alia, Spino v. John S. Tilley Ladder Co.,* 448 Pa.Super. 327, 671 A.2d 726, 738 (1996) ("A party is entitled to cross-examine an expert witness to explore the credibility of the witness and to inquire into any potential bias, interest or relationship which could [a]ffect the testimony of the witness."), *aff'd on other grounds,* 548 Pa. 286, 696 A.2d 1169 (1997), and *Coward v. Owens–Corning Fiberglas Corp.,* 729 A.2d 614 (Pa.Super.1999) (approving the allowance of cross-examination of an asbestos defendant's expert witness concerning the amount of money that he had earned from any asbestos manufacturer over the course of the prior twenty years).[4] The court also surveyed several decisions from other jurisdictions, including *Wrobleski v. Nora de Lara,* 353 Md. 509, 727 A.2d 930, 938 (1999) ("[I]t is generally appropriate for a party to inquire whether a witness offered as an expert in a particular field earns a significant portion or amount of income from applying that expertise in a forensic setting."), *Metropolitan Property and Cas. Ins. Co. v. Overstreet,* 103 S.W.3d 31, 39–40 (Ky.2003) ("A jury could reasonably believe that a physician who derives a substantial percentage of his annual income from [defense medical] examinations, potentially earning hundreds of thousands of dollars every year from such examinations alone, might be tempted to slant his testimony to suit his employer."), *Trower v. Jones,* 121 Ill.2d 211, 117 Ill.Dec. 136, 520 N.E.2d 297, 300 (1988) (finding it proper to inquire how much an expert medical witness earned annually for litigation services), and. *Trend South, Inc. v. Antomarchy,* 623 So.2d 815, 816 (Fla.Dist.Ct. App.1993) ("[I]nformation regarding income generated by a physician's performance of independent medical examinations for insurance companies and law firms is relevant and discov-

4. Although *Coward* was accepted for this Court's review, *see Coward v. Owens–Corning Fiberglas Corp.,* 560 Pa. 705, 743 A.2d 920 (1999) (*per curiam* ), the appeal was subsequently stayed in the wake of federal bankruptcy proceedings, and the matter was later closed.

erable to prove potential bias."). Additionally, the Superior Court noted that the Federal Rules of Civil Procedure provide for disclosure by an expert of any other cases in which the witness has testified as an expert by trial or deposition within the preceding four years. *See* Fed.R.Civ.P. 26(a)(2)(B).

The panel acknowledged that a legitimate concern arose with regard to the intrusiveness of the discovery of personal financial records. *See Cooper*, No. 1164 MDA 2003, *slip op.* at 11, 2004 WL 1969347, at *6 ("We recognize that zealous counsel cannot be permitted to embark upon an intrusive discovery campaign directed against an expert."). However, the court indicated that, under the rules, Pennsylvania trial courts are equipped to prevent abuses, quoting reasoning from *State ex rel. Creighton v. Jackson*, 879 S.W.2d 639 (Mo.App. 1994), as follows:

> The trial court should, of course, restrict discovery so that it is no more intrusive than necessary. Counsel should never be permitted to harass, badger and humiliate the proposed witness with inquiries not strictly necessary to the discovery of matters relevant to professional objectivity. The privacy of the expert as to personal finances, professional associations, and patient/clients should be respected and should be invaded only as necessary to insure the honesty and accountability of the expert in responding to legitimate inquiries. It must also be recognized, however, that a venal expert witness could not be expected to fully answer inquiries as to which the witness is not required to produce documentation. A delicate balancing of privacy interests against the need for accountability therefore becomes the responsibility of the trial court.

*Id.* at 643 (quoting *State ex rel. Lichtor v. Clark*, 845 S.W.2d 55, 65 (Mo.App.1992)).

 Soon after the decision in *Cooper*, a different panel of the Superior Court issued a decision approving similar discovery from Dr. Eagle in another case. *See J.S. v. Whetzel*, 860 A.2d 1112 (Pa.Super.2004). We allowed appeal in the *Cooper* case to address the discovery issue. To the degree that the matter involves an interpretation of this Court's rules,

our review is plenary. Within the ambit of the discretionary authority allocated by the rules to the trial courts, we review for abuse of discretion.

Presently, Dr. Eagle maintains that the discovery sought by Ms. Cooper is beyond that permitted of an expert witness. In this regard, he supports Judge Lewis's view that the restrictive terms of Rule 4003.5 control, describing the position that any information outside the scope of Rule 4003.5 falls back into the liberal sweep of Rule 4003.1 as untenable bootstrapping.[5] According to Dr. Eagle, the approach endorsed by the Superior Court and Ms. Cooper would authorize litigants, without seeking leave of court or paying expert fees, to freely depose an opposing party's expert witness on virtually any subject except the one most central to the litigation (the expert's opinion on the facts of the case). *Accord Kern v. Chambersburg Hosp.*, 9 Franklin 69, 72 (1986) ("If this were true, almost any conceivable information concerning an expert would be discoverable. This belies the intent of Rule 4003.5 which is to limit Rule 4003.1."); *see also Alston v. Outboard Marine Corp.*, 12 Pa. D. & C.4th 297, 302–03 (1991). He urges that this cannot have been this Court's intention in promulgating Rule 4003.5. *See generally* Pa.R.Civ.P. No. 127 (delineating proper considerations for interpreting rules when the text is not explicit, including, *inter alia,* the occasion and necessity for the rule, the object to be attained, and the consequences of a particular interpretation). Along these lines, Dr. Eagle also highlights that Judge Lewis's approach on this aspect has been the prevailing one in the Pennsylvania trial courts.[6]

5. While acknowledging that, generally, Rule 4003.1 provides for liberal discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action," Pa.R.Civ.P. No. 4003.1, Dr. Eagle highlights that the rule specifically states that it is "subject to the provisions of Rules 4003.2 to 4003.5 inclusive," which place limits on the scope of discovery available to litigants. *Id.*

6. *See* Brief for Appellant at 11 (citing, *inter alia, Robbins v. Rahimzadek,* 54 Pa. D. & C.4th 221, 223 (2001) ("Clearly such discovery [of financial information regarding an opposing party's expert witness] would not be permitted absent an order of court for 'cause shown' pursuant to Pa.R.C.P. 4003.5(a)(2)."), *Monteiro v. Dow Chem.,* 19 Phila.Co.Rptr.

As to the cause criterion, Dr. Eagle recognizes that neither the Rules of Civil Procedure nor the decisional law specifies a particular test for determining cause supporting the discovery of financial information from an expert witness. In addressing this void, he suggests that the Court should adopt an approach that centers the litigation on the main issues by limiting forays into collateral impeachment avenues,[7] and that affords due and ample respect to the privacy interests of expert witnesses in personal financial information. As to the privacy concern, Dr. Eagle references general commentary from the federal courts, *see, e.g., Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 109, 115 (3d Cir.1987) (observing that "public disclosure of financial information may be personally embarrassing and highly intrusive"), as well as rulings on discovery motions seeking tax records recognizing a qualified privilege and imposing high standards of relevancy before parties will be ordered to produce such records. *See Eastern Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 96 F.R.D. 147, 148–49 (E.D.Va.1982); *Mitsui & Co. v. Puerto Rico Water Res. Auth.*, 79 F.R.D. 72, 80 (D.Puerto Rico 1978).

Further, Dr. Eagle contends that, under the *Zamsky* and *Mohn* decisions, the financial affairs of an expert witness (other than those bearing a substantially direct connection

221, 223, 1989 WL 817119 (1989) ("The only discovery that is allowed as a matter of right are interrogatories, and these are expressly limited to the discrete subjects described in Rules 4003.5(a)(1)(a) and (b). Supplemental discovery from an expert is only available by stipulation between the parties, or after a successful application to a judge who must be satisfied that there is 'cause shown.' "); *Kern*, 9 Franklin at 72 (explaining that "the court finds it difficult to believe that the drafters [of Rule 4003.5] intended to encourage parties to slog through a morass of prior expert testimony, and to delve into the vast pool of authorities that they have been exposed to, all for the sake of impeachment"), and *Benson v. Dorko*, 35 Cumberland L.J. 231, 235 (1984) ("If the Supreme Court had wanted the liberal discovery provisions in Rule 4003.1 to have applied to experts they would not have made that Rule subject to the limitations in Rule 4003.5.")).

7. *Accord Jones v. Faust*, 852 A.2d 1201, 1206 (Pa.Super.2004) (holding that expert witnesses' reports from independent medical examinations over the preceding year were not discoverable, because "the information sought is for impeachment purposes, an objective which could be accomplished by other, less intrusive, means, e.g., the contrary testimony of another physician").

with discrete court proceedings) are beyond the scope of available cross-examination at trial, which Dr. Eagle argues is limited to aspects of the witness's financial interest that are demonstrably probative of any bias that he may harbor in favor of the law firm retaining him.[8] Dr. Eagle maintains that this approach is also sensible because it prevents matters relating to insurance from surfacing before juries, and it obviates any need for burdensome efforts to align practice records with tax records.[9] Dr. Eagle also posits that the purpose for which Ms. Cooper seeks his tax records, impeachment, can be accomplished through less intrusive and burdensome means, and that a holding allowing discovery in this case would establish a categorical rule permitting collateral discovery in every case. See Brief for Appellant at 21–22 ("Plaintiff has not shown any cause for the supplemental discovery sought; and no cause exists in this case which would not also apply to independent medical evaluations in any other personal injury action. Therefore, directing Dr. Eagle to produce his

8. See Zamsky, 378 Pa. at 40, 105 A.2d at 336 ("The earnings of the expert witness from other services performed by the defendant were a purely collateral matter and the testimony thereon was not admissible to affect his credibility."); Mohn, 357 Pa.Super. at 179, 515 A.2d at 923–24 (reasoning that the nexus between an expert's compensation for services rendered to entities other than the defense attorney's law firm and credibility was "tenuous at best," indicating that plaintiffs' entitlement to inquire into experts' potential bias does not encompass "the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny," and holding that a trial court abused its discretion by permitting cross-examination regarding an expert's income that was unrelated to the results of trial).

9. On this point, Dr. Eagle observes that he maintains a practice in addition to performing medicolegal services, and thus, receives payments from insurance companies for first-party treatment in addition to fees for their expert witness services. Therefore, he claims that it would be very difficult and time consuming for him (and other similarly situated physicians) to reconstruct the details of underlying payments reflected on federal 1099 forms. Cf. J.S. v. Whetzel, 860 A.2d at 1121 (recognizing that some of Dr. Eagle's 1099 forms "may contain payments from insurance companies or other sources where no litigation was involved, or payments by attorneys in cases unrelated to personal injury," and remanding to the trial court for entry of an order protecting from discovery "those 1099 forms that are unrelated to this case," while noting that "the court may need to conduct additional inquiry to determine which 1099 forms are relevant.").

1099 forms would be tantamount to rewriting the Rules of Civil Procedure pertaining to expert discovery."); *accord Robbins*, 54 Pa. D. & C.4th at 224 ("If I were to allow statistical discovery, I would not be deciding 'cause shown' in a particular case, but rather would be rewriting the rule for every case.").

In the broader frame, Dr. Eagle couches his appeal as an attempt to moderate what he regards as an emerging tactic of the plaintiffs' trial bar to routinely probe into the personal financial affairs of medical defense experts to "exact a price," in terms of the doctor's privacy, for performing an independent medical examination and testifying on a defendant's behalf. According to Dr. Eagle, three important public policy issues are implicated by the allowance of discovery of collateral expert witness financial records. He argues that discovery of an expert witness's financial affairs: has a chilling effect on the availability of qualified and experienced expert witnesses, *see, e.g.*, Brief for Appellant at 17 ("Parties will wage a war of attrition by conducting onerous discovery of experts regarding collateral matters for purposes of impeachment."); substantially increases the burden, expense, and delay attendant on permitting parties to delve into matters that are collateral to the central issues in personal injury litigation, *see Elkins v. Syken*, 672 So.2d 517, 522 (Fla.1996) (highlighting that discovery was "never intended to be used as a tactical tool to harass an adversary in a manner that actually chills the availability of information by non-party witnesses; nor was it intended to make the discovery process so expensive that it could effectively deny access to information and witnesses or force parties to resolve their disputes unjustly"); and has a disproportionate, adverse impact on the defense.[10] *See generally*

10. Dr. Eagle argues that the Superior Court's *Cooper* decision, while appearing neutral on its face, is biased against the defense in light of "undeniable realities of personal injury litigation." Brief for Appellant at 16. In this regard, he elaborates on his perspective as follows:

It is axiomatic and to be expected that the defendant's attorney or insurance carrier chooses the doctor to perform the independent medical examination. While a plaintiff's treating physician is often determined by chance circumstance, and not by the plaintiff's lawyer, doctors who evaluate claims in litigation, and offer opinions from a

*Syken v. Elkins,* 644 So.2d 539, 544–45 (Fla.App.3d DA 1994) (concluding decisions on the issue of discovery of financial information from experts "have gone too far in permitting burdensome inquiry into the financial affairs of physicians, providing information which 'serves only to emphasize in unnecessary details that which would be apparent to the jury on the simplest cross-examination: that certain doctors are consistently chosen by a particular side in personal injury cases to testify on its respective behalf' " (citation omitted)), *aff'd, Elkins,* 672 So.2d at 517.

Ms. Schoffstall's brief follows many of the points made by Dr. Eagle and highlights that Ms. Cooper has already assembled "an arsenal of legal documents" related to Dr. Eagle's performance of medicolegal services, such that "the generic intent to 'prove bias' is unpersuasive at best." Brief for Ms. Schoffstall at 7. Ms. Schoffstall also sets forth her views concerning the assertedly improper motives of plaintiffs in seeking financial records from defense experts. *See id.* at 12 ("The personal tax information, other than records of payments made from defense counsel, is merely a gratuitous effort to impugn his credibility, disrupt his business, prevent him from ever desiring to offer medical-legal services again, and bully any potential expert witness from offering similar services.").

Ms. Cooper, for her part, denies the improper motives attributed to her and/or her counsel by Dr. Eagle and Ms. Schoffstall. Rather, she regards the sought-after discovery as an essential response to a defense tactic of cultivating and employing "professional witnesses," as well as the evasiveness of such witnesses in responding to legitimate inquiries con-

---

non-treatment perspective for the defense, are in almost every instance asked to serve in that role by the defense lawyer. Thus, their service is inevitably "defense-related." Under this ruling, doctors who take such engagements will be subject to attack for being biased, simply because they have been engaged and compensated by the defense. Any expert who has performed "defense related" work on more than a few occasions becomes potentially damaged goods, because his past earnings from other engagements must be shown to the adversary as a routine discovery screen against potential bias. Brief for Appellant at 16–17.

cerning the extent of their financial entanglements with defense firms and/or the insurance industry. In the case of Dr. Eagle, Ms. Cooper highlights the excerpts that she presented to Judge Lewis as establishing his substantial involvement, for at least thirteen years, in conducting examinations for defense attorneys, rehabilitation firms, and insurance companies. Additionally, she suggests that, although Dr. Eagle has acknowledged in the past that payment for defense medical examinations represent a "big ticket item" in terms of his income, he has frequently been evasive in answering questions seeking a more concrete understanding of the monetary significance to him of these activities. Ms. Cooper also references the litigation materials to suggest that Dr. Eagle has been vague and inconsistent in his responses to questions concerning the raw number of his litigation-related ventures in any given year. Furthermore, she maintains that the excerpts demonstrate predictable findings and conclusions employed by Dr. Eagle to minimize or negate plaintiffs' damages in personal injury actions.[11]

Ms. Cooper regards the above as an ample foundation to support discovery to explore the partiality question. She also characterizes her discovery request as highly focused and minimally intrusive, in that it does not implicate unbridled access to Dr. Eagle's entire financial holdings, complete tax returns, or medical office records, but rather, requires only the production of recent federal 1099 forms received from defense firms and/or insurance companies. Without the ability to obtain concrete evidence of the alleged pattern of bias, Ms. Cooper projects that impeachment cross-examination is likely to be unavailable or ineffective against a skilled, experienced expert who, knowing that he or she is safe from contradiction, may equivocate and prevaricate with impunity. For these reasons, Ms. Cooper suggests that Judge Lewis exercised sound discretion and restraint in approving the

11. Dr. Eagle's rejoinder is that the excerpts presented by Ms. Cooper were gathered by a selective process, and inconsistencies among his answers are accounted for by the fact that the degree of his involvement in providing litigation services has varied over the years.

discovery, as the information before him amply demonstrated "cause shown" under the Rule 4003.5 standard that he applied.

Ms. Cooper also argues, however, that a demonstration of cause is not an essential prerequisite to obtaining discovery of collateral information related to potential bias from an expert witness under the Rules of Civil Procedure. Consistent with the Superior Court's approach, Ms. Cooper regards Rule 4003.5 as directed only to trial preparation material and Rule 4003.1 as containing an independent grant of authority for discovery of subjects not specifically covered by Rule 4003.5(a).

Ms. Cooper also differs with Dr. Eagle's contention that the decisional law closely restricts cross-examination concerning the extent of an expert witnesses' financial remuneration from defense firms and insurance companies. It is her position that evidence that an expert witness's testimony may be colored by bias or self-interest is nearly always relevant and is of strong probative value as impeachment evidence. *Accord Primm v. Isaac,* 127 S.W.3d 630, 634 (Ky.2004) ("No intellectually honest argument can be made that ... activities as a defense expert are not relevant for impeachment for bias."). In this regard, she highlights decisions of Pennsylvania courts that have defined potential bias in broad terms. *See, e.g., Grutski v. Kline,* 352 Pa. 401, 406, 43 A.2d 142, 144 (1945) ("Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination." (quoting *Commonwealth v. Farrell,* 187 Pa. 408, 423, 41 A. 382, 384 (1898))). Further, Ms. Cooper takes issue with Dr. Eagle's reading of the Superior Court's *Mohn* decision by way of reference to subsequent decisions that have permitted broader questioning, such as the *Cowan* decision cited by the Superior Court. *See also Smith v. Celotex Corp.,* 387 Pa.Super. 340, 564 A.2d 209 (1989) (finding, in a personal injury action grounded on asbestos exposure, no reversible error in the trial court's decision to permit the defendant's medical expert to be questioned about fees generated from testimony on behalf of defendants in other asbestos cases). Ms. Cooper indicates that trial and appellate courts exercise care in imposing reasonable restric-

tions on the extent of the disclosure to protect the expert's privacy interests, as she contends occurred here and in the analogous decision of the Superior Court in the *J.S.* case, also involving Dr. Eagle.

Ms. Cooper also differs with Dr. Eagle in terms of the degree to which the tax records differentiate between first-party payments and payments related to expert witness testimony. Further, she suggests that the approach that she advocates applies evenly to experts retained by plaintiffs and defendants alike. Finally, like Dr. Eagle, Ms. Cooper also references decisions of other jurisdictions that contain lines of reasoning that are in general conformity with her arguments. *See, e.g., Primm,* 127 S.W.3d at 630; *Wrobleski,* 727 A.2d at 930.

■ As a threshold matter, we agree with Judge Lewis's position (and that of many other trial judges, *see supra* note 6), that Rule 4003.5 should be read to restrict the scope of all discovery from non-party witnesses retained as experts in trial preparation. While the Superior Court and Ms. Cooper are correct that the plain terms of the Rule do not make this limitation clear, we believe that the better practice is to channel inquiries into collateral information through the Rule's "cause shown" criterion. *See* Pa.R.Civ.P. No. 4003.5(a)(2). Notably, even the cases highlighted by Ms. Cooper tend to recognize a particularized need for trial court involvement in determining the appropriate scope of discovery in individualized circumstances. *See Wrobleski,* 727 A.2d at 938 ("The allowance of the permitted inquiry, both at the discovery and trial stages, should be tightly controlled by the trial court and limited to its purpose[.]"). The effect is to center the discovery on the main issues and to reduce the intrusiveness and burden of collateral forays, while permitting such additional inquiries as the interests of justice may require in special circumstances, as determined within the sound discretion of the supervising court.

The remaining interpretive issue entails consideration of whether there are appropriate, general boundaries that should

define the range of special circumstances that will support supplemental discovery from an expert witness on the issue of potential favoritism arising from the regular acceptance of compensation for medicolegal work.

In the first instance, it is necessary to address Dr. Eagle's argument that cause simply cannot exist, since the financial information involved does not meet even the lower threshold governing discovery generally, namely, the requirement that the request be reasonably calculated to lead to the discovery of admissible evidence. *See* Pa.R.Civ.P. No. 4003.1(a).[12] As Dr. Eagle emphasizes, his position in this regard finds substantial support in the holding in *Zamsky*, 378 Pa. at 38, 105 A.2d at 335, where this Court found no relevance of compensation for collateral activities undertaken by an expert witness through which he had received significant financial remuneration from the defendant. *See id.* at 40, 105 A.2d at 336.

*Zamsky's* reasoning is as follows. Initially, the Court observed that prior decisions had approved inquiries concerning the fees expert witnesses earned for testifying in the case at trial, but that those decisions did not concern fees earned for similar types of activities. *See id.* Having thus recognized that the issue was one of first impression before the Court, *Zamsky* resolved the question is a single, conclusory sentence: "The earnings of the expert witness from other services performed for the defendant were a purely collateral matter and the testimony thereon was not admissible to affect his credibility." *Id.* There is no mention in *Zamsky* of the matter of potential favoritism arising from substantial monetary compensation, nor is there any consideration of the professional witness phenomenon. *Compare Wrobleski*, 727 A.2d at 932–34 (surveying decisional law and commentary beginning in the 1800s and continuing through the present reflecting the substantial concern with the grounding of expert testimony in

12. While adherence to the general standard pertaining to discovery certainly cannot be sufficient to establish additional "cause shown" under Rule 4003.5, we agree with Dr. Eagle that it is an essential prerequisite to cause.

light of the various financial incentives that may be connected with that testimony). *See generally* Michael H. Graham, *Impeachment of Expert Witness—Financial Interest*, 21 AM. JUR. PROOF OF FACTS 73 § 1 (2005) ("The professional expert witness has become a fact of life in the litigation process.").

Given that there is little depth in *Zamsky's* treatment, we do not regard it as the type of decision that should greatly constrain future consideration and/or adjustment, particularly across the broader range of cases. *Cf. Ayala v. Philadelphia Bd. of Pub. Ed.*, 453 Pa. 584, 606, 305 A.2d 877, 888 (1973) ("[T]he doctrine of *stare decisis* is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish"). In particular, we find nothing in *Zamsky's* reasoning that provides an adequate basis for disagreement with the general proposition, recognized by most other courts, that a "pattern of compensation in past cases raises the inference of the possibility that the witness has slanted his testimony in these cases so he could be hired to testify in future cases." *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir.1980).[13] Notably, even those jurisdictions that have substantially limited discovery of financial information from expert witnesses generally recognize the relevance of the information, albeit that they hold that its production as a matter of course would inject undue burden and expense into litigation and/or may have a chilling effect on the participation of experts. *See, e.g., Syken*, 644 So.2d at 544; *accord Elkins*, 672 So.2d at 519.[14]

**13.** To its comment, quoted above, the *Collins* court added the following, salient perspective:

This Court does not suggest that [the expert witness's] testimony has ever been influenced by the compensation he has received. The Court's close analysis of the transcript reveals [him] to be an able, dedicated engineer. Furthermore, we recognize that professional expert witnesses often furnish testimony that is essential to the truth seeking process. Nonetheless, ability and dedication cannot insulate anyone from the suggestions of bias that a cross-examiner brings out when he plays his role in a trial.

*Collins*, 621 F.2d at 784 n. 5.

**14.** Notably, as well, Florida procedure as delineated in the *Syken* case, although restrictive, permits an expert to be deposed as a matter of

*Zamsky* aside, we agree with the Superior Court that it is necessary to balance the respective interests involved to set the most suitable contours for discovery (and ultimately admissibility). *Accord Primm,* 127 S.W.3d at 632; *Syken,* 644 So.2d at 544; *State ex rel. Creighton v. Jackson,* 879 S.W.2d 639, 642 (Mo.App.1994). On the one hand, Ms. Cooper has an interest in the availability of some reasonable opportunity to inquire into the issue of potential favoritism, in light of the information that she has already assembled concerning Dr. Eagle's medicolegal experience developed at the behest of defense attorneys and/or the insurance industry. Dr. Eagle, on the other hand, maintains an interest in being free from unduly intrusive and burdensome litigation obligations. Additionally, we are cognizant of the broader concern with a potential chilling effect to which Dr. Eagle, and some courts, have referred.

▆▆▆ Therefore, we believe that the appropriate, threshold showing to establish cause for supplemental discovery related to potential favoritism of a non-party expert witness retained for trial preparation is of reasonable grounds to believe that the witness may have entered the professional witness category. In other words, the proponent of the discovery should demonstrate a significant pattern of compensation that would

course, and, in such effort, limited questioning is permitted regarding potential bias. *See Syken,* 644 So.2d at 546.

Pennsylvania's experience with the issue of the appropriate scope of discovery and cross-examination of expert witnesses concerning potential favoritism is not unlike that of other jurisdictions that have come to recognize the relevance of substantial compensation over time from the perspective of a particular interest. *See, e.g., Trower,* 117 Ill.Dec. 136, 520 N.E.2d at 299–301 (departing from an earlier line of decisions disapproving questioning of expert witnesses concerning compensation received in unrelated cases). *See generally* Russell G. Donaldson, *Propriety of Cross–Examining Expert Witness Regarding His Status As "Professional Witness",* 39 A.L.R.4th 742 § 2[a] (1985) (recognizing that, [a]lthough some early cases appear to have taken a more or less categorical view as to the propriety of such questioning generally by stating that certain specific questions in areas devoted to the elicitation of an expert's " 'professional witness' status were simply not permissible, as with most issues concerning the propriety of cross-examination, the question of whether to permit cross-examination devoted to eliciting such status is today regarded as a matter largely within the discretion of the trial court[.]").

support a reasonable inference that the witness might color, shade, or slant his testimony in light of the substantial financial incentives. *Accord Wrobleski,* 727 A.2d at 936 (quoting *Collins,* 621 F.2d at 784). In the present case, we have no difficulty in supporting Judge Lewis's decision to authorize some supplemental discovery in Dr. Eagle's situation, where it is undisputed that in some recent years he has performed 200 or more independent medical examinations.

We are also cognizant, however, that other courts, with good reason, have directed the entry point for discovery toward questioning of the witness, as opposed to production of the witness's financial records. For example, the Florida courts have recognized that particularized inquiry into the financial affairs of an expert may serve only to highlight, in unnecessary detail, "that which would be apparent to the jury on the simplest cross-examination: that certain doctors are consistently chosen by a particular side in personal injury cases to testify on its respective behalf." *Syken,* 644 So.2d at 545 (quoting *LeJeune v. Aikin,* 624 So.2d 788, 789 (Fla.Dist.Ct. App.1993) (Schwartz, C.J., concurring)).[15] Further, we agree with Dr. Eagle that substantial effort may be involved in producing information providing meaningful disclosure concerning the specific financial information desired by Ms. Cooper. *See supra* note 9.

■ In keeping with the idea that the discovery along these lines should be of the least burdensome and intrusive kind possible, we believe that the appropriate entry point, upon the showing of cause, is a deposition by written interrogatories under Rule of Civil Procedure 4004. Through this vehicle, and subject to the trial court's exercise of its sound discretion, the proponent of the discovery may be permitted to inquire as to the following: the approximate amount of compensation received and expected in the pending case; the character of the witnesses' litigation-related activities, and, in particular, the approximate percentage devoted to specific types of litigation and/or work on behalf of a particular litigant, class of

**15.** The primary difficulty in Pennsylvania has been that, under *Zamsky,* litigants previously have been constrained unduly in their ability to accomplish the simplest cross-examination along these lines.

litigant, attorney, and/or attorney organization; the number of examinations, investigations, or inquiries performed in a given year, for up to the past three years; the number of instances in which the witness has provided testimony within the same period; the approximate portion of the witness's overall professional work devoted to litigation-related services; and the approximate amount of income each year, for up to the past three years, garnered from the performance of such services.[16] While we recognize that some jurisdictions have limited this form of discovery to exclude the income category, *see, e.g., Syken,* 644 So.2d at 546, we believe that this limited aspect of income information is within the fair scope of relevance on the question of potential favoritism. *Accord Wrobleski,* 727 A.2d at 938 ("If there is a reasonable basis for a conclusion that the witness may be a 'professional witness,' the party may inquire ... into the amount of income earned in the recent past from services as an expert witness[.]").[17]

■ We will not at this juncture foreclose the trial courts, after an assessment of the interrogatory responses, and upon appropriate motion, from determining whether there is cause to support further supplemental discovery along the lines of what was approved by Judge Lewis in this case.[18] For example, such discovery might be warranted if there is a strong showing that the witness has been evasive or untruth-

16. To the degree that the witness will incur expenses connected with the deposition, the trial court has discretion to allocate costs appropriately, *see* Pa.R.Civ.P. No. 4003.5(a)(2), and we would expect that the questions often may be propounded to the expert deponent at a convenient time at his regular place of business.

17. *Wrobleski* also approved inquiries into the approximate portion of the witness's total income derived from medicolegal services. *See Wrobleski,* 727 A.2d at 938. Such information is of a more intrusive nature, as it yields disclosure of the witness's approximate total income, and therefore, we decline to approve the production or admission into evidence of such information in the absence of compelling circumstances.

18. We recognize the federal decisions cited by Dr. Eagle that have recognized a qualified privilege applicable to tax records; such privilege, however, may be overcome by a showing of relevance and need, similar to the requirements delineated here. *See, e.g., Eastern Auto Distribs.,* 96 F.R.D. at 148–49.

ful in the written discovery. *Cf. State ex rel. Creighton v. Jackson,* 879 S.W.2d 639, 643 (Mo.App.1994) (holding that a trial court did not abuse its discretion in requiring production of limited financial records including 1099 forms from an expert witness, where the witness was not forthcoming in previous depositions).[19] In all likelihood, however, in a case such as this one, the written interrogatories will produce sufficient information to support adequate trial preparation. With the responses, and subject to the trial court's exercise of sound discretion in the admission of evidence and in controlling the scope of cross-examination, within reasonable limits Ms. Cooper may suggest to the jury the same potential inference that gave rise to the cause supporting the supplemental discovery. Certainly, as well, Ms. Schoffstall may counter with her position that Dr. Eagle's opinions are nonpartisan and neutral, and that he was chosen for his medical and communications skills.

Since we find that there are procedures supporting adequate trial preparation on the issue of potential bias of nonparty expert witnesses less burdensome than production of personal financial records, the orders of the Superior Court and the common pleas court are vacated, without prejudice to the common pleas court's ability to authorize discovery consistent with this opinion.

Jurisdiction is relinquished.

Chief Justice CAPPY and Justice CASTILLE, EAKIN, and BAER join in the opinion.

Justice NIGRO did not participate in the decision of this case.

Justice NEWMAN files a concurring opinion.

19. We decline to resolve the parties' present dispute as to whether or not Ms. Cooper's similar submission of excerpts from previous depositions demonstrates evasiveness and inconsistency on Dr. Eagle's part or constitutes an incomplete and selective portrayal fashioned by Ms. Cooper. Such determination is complicated by the informal character of that submission and is rendered unnecessary in this case by our decision to require pursuit of a less burdensome avenue of discovery, upon cause, as a threshold.

Justice NEWMAN, concurring.

I agree with the Majority that the Orders of the Superior Court and the Dauphin County Court of Common Pleas must be vacated, but write separately to emphasize my belief that pursuing the personal financial information of an expert witness is, with few exceptions, an abuse of the discovery process. The Pennsylvania Rules of Civil Procedure limit the scope of discovery to "any matter, not privileged, which is relevant to the subject matter involved in the pending action...." Pa. R.C.P. No. 4003.1. Discovery of expert testimony is limited to "facts known and opinions held by an expert ... acquired or developed in anticipation of litigation or for trial...." Pa. R.C.P. No. 4003.5(a). As indicated by the Majority, additional discovery may be sought from an expert witness "upon cause shown." However, cause shown is limited to "such restrictions as to scope and such provisions concerning fees and expenses as the court may deem appropriate." Pa.R.C.P. No. 4003.5(a)(2). Thus, the trial court has the discretionary authority to expand the discovery of expert opinions "acquired or developed in anticipation of litigation or for trial" upon cause shown or may permit reasonable inquiry about fees and expenses "upon cause shown." That discretion is limited, as noted by the Majority to a showing of cause. While it may generally be appropriate for a party to inquire whether a witness offered as an expert in a particular field earns a significant portion or amount of income from applying that expertise in a forensic setting, I believe that the trial court abused its discretion and that Dr. Eagle is being subjected to an inappropriate expedition into his personal and financial records.

The general belief is that expert testimony adds an aura of reliability to the theories and claims proffered by the parties. Further, the proliferation of forensic programs in the media has conditioned jurors to expect testimony from experts in the majority of cases. The general trial strategy descends to an attack on the credibility of the expert witness to diminish his or her effectiveness in the eyes of the fact finder and to enable the opposing party to "lift [the expert's] visor, so that the jury

[can] see who he was, what he represented, and what interest, if any, he had in the results of the trial." *Goodis v. Gimbel Bros.*, 420 Pa. 439, 218 A.2d 574, 577 (1966). In the instant matter, this attack took the form of a subpoena that required Dr. Eagle to produce "all federal 1099 forms received by [him] from any insurance company or law firm in connection with medical/legal independent medical examinations, the preparation of reports, examinations, and depositions for the years 1997 through 2001." (Superior Court Memorandum Opinion, page 2.) While the trial court limited the production of 1099s to the period from 1999 through 2001, the request for proof of income received from any insurance company or attorney involving independent medical examinations and depositions during this period is overbroad because unfettered production of any and all of Dr. Eagle's 1099 forms could involve payments from insurance companies or other sources where no litigation was involved, or payments by attorneys in cases unrelated to personal injury. It could also reflect payments from attorneys or insurance companies for which Dr. Eagle did not end up testifying.

The Maryland Court of Appeals in *Wrobleski v. Nora de Lara*, 353 Md. 509, 727 A.2d 930, 938 (1999), cited with approval by the Majority, found that a party may inquire both into the amount of income earned in the recent past from services as an expert witness and into the approximate portion of the witness' total income derived from such service. The Court hastened to add, however, two important caveats:

First, we do not intend by our decision today to authorize the harassment of expert witnesses through a wholesale rummaging of their personal and financial records under the guise of seeking impeachment evidence. The allowance of the permitted inquiry, both at the discovery and trial stages, should be tightly controlled by the trial court and limited to its purpose, and not permitted to expand into an unnecessary exposure of matters and data that are personal to the witness and have no real relevance to the credibility of his or her testimony. Second, the fact that an expert witness devotes a significant amount of time to forensic activities or

earns a significant portion of income from those activities does not mean that the testimony given by the witness is not honest, accurate, and credible.

*Id.* at 938. I would also observe that the amount of an expert's income may be irrelevant altogether because the more skilled the professional, the more specialized or more complex the field, or the greater the expert's professional acclaim or reputation, the more he or she can charge for their services. Thus, an expert may earn a substantial income from forensic or analytical services because he or she is a leader in the field and not because he or she will serve any master for a price.

This Court has recognized that the level of a witness's compensation is a proper subject of cross-examination, tending to flush out any bias of the witness. *See Zamsky v. Public Parking Auth.,* 378 Pa. 38, 105 A.2d 335 (1954); *Commonwealth v. Simmons,* 361 Pa. 391, 65 A.2d 353 (1949); *Grutski v. Kline,* 352 Pa. 401, 43 A.2d 142 (1945). Cross-examination of an expert on financial bias, whether in a deposition or at trial, however, should generally reflect his or her compensation in the particular case and his or her relationship with the party or lawyer employing the expert. The fact that an expert witness has received generous compensation, coupled with such red flags as dubious methodology, the inability to test the expert's hypothesis, or a lack of general acceptance in the related field, may reasonably suggest that the expert has allowed his or her bank account to overcome his or her professional judgment. It is unduly burdensome to require an expert witness to compile financial information regarding his or her expert activities over an extended period of years. It is an inappropriate and, indeed, unnecessary inquiry in the case *sub judice* considering the amount of information Ms. Cooper has already amassed. Therefore, I agree with the Majority that before an expert is required to bare his or her financial soul, sufficient cause must be shown in the nature of falsity, deception, or misrepresentation for purposes of denying bias. I am pleased that Pennsylvania is joining those select few of our sister states that have held that requiring an expert

witness to produce personal financial information is generally an abuse of the discovery process.[1]

---

1. *See, e.g., Araiza v. Roskowinski–Droneburg,* 341 Md. 314, 670 A.2d 466 (1996); *Donelson v. Fritz,* 70 P.3d 539 (Colo.Ct.App.2002); *Syken v. Elkins,* 644 So.2d 539 (Fla.Dist.Ct.App.1994).